WILTON E. PEIRCE *vs.* HENRY A. PALMER.

JULY 7, 1910.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1) *Attorney and Client. Complaints. Summary Order.*

Respondent having been acting as attorney for complainant, the latter delivered to him a sum of money for the purpose of paying same to three legatees; it being the expectation of both that the money would be paid over within a few days. Respondent notified legatees that he had received the money for them, and deposited it in his own account, which at all times. up to the time, three days later, when respondent claimed that complainant. directed him to deduct the amount of his fee for services from said sum, exceeded the amount delivered to him. Respondent, within a few days, having become dissatisfied with complainant's conduct, notified him that he would no longer act as his counsel, inclosed bill for services, and demanded immediate payment, advised him that he had become counsel for the legatees against the estate, and also notified him that he would hold him responsible for slander. Respondent claimed that afterwards complainant terminated the trust under which the money paid to him was held, and directed respondent to apply a sufficient amount to the payment of his bill. It was urged that this agreement was made under intimidation and oppression, and the agreement itself was denied by complainant:—

*Held,* that unless the evidence conclusively established such oppression, the court should not so find in an extraordinary proceeding for a summary order, but the parties should be left to their ordinary legal remedies.

*Held,* further, that, from the testimony, the reasonableness of respondent's bill not having been determined, and no confidential relation existing be-

tween them at the time, the court could not find that the payment of the bill and the termination of the trust was forced by intimidation, nor that respondent was holding the fund for the specific purpose for which it was originally placed in his hands. Hence, this being so, the court will not exercise its summary jurisdiction, but will leave complainant to his remedy at law.

(2)  *Attorney and Client.  Summary order.*

In no case has the court exercised its jurisdiction by summary order, except as to matters about which there was no reasonable dispute.  As to disputed questions an attorney's rights should not be concluded by a summary order.

(3)  *Jurisdiction of Committee on Complaints.*

The court can not delegate any of its authority to the committee on complaints. Its report is of assistance to the court in deciding whether to take action on charges or to leave complainants to their remedies at law, but its report can never be used as the basis of an order against an attorney.  A summary order should be made only after the parties and witnesses have appeared and given their sworn testimony before the court.

(4)  *Attorney and Client.*

Upon the above facts the respondent was not justified in acting as counsel against the complainant in the same general matter in which he had been before engaged in behalf of the complainant, and he will be required to withdraw his appearance and cease to so act.

Complaint against the respondent as a member of the bar, and petition for an order of court requiring the respondent to pay over certain moneys received by him as attorney.

SWEETLAND, J.   This is a complaint against the respondent, as an attorney and counsellor at law, setting forth that the complainant, as executor of the will of Mary Holden, placed in the hands of the respondent, as his attorney, fifteen hundred dollars to be used by him for the specific purpose of settling three legacies of five hundred dollars each due to Martha J. Magill, Augusta Palmer, and Mary E. Kelly; that on October 7th, 1909, the respondent notified the complainant that he had deducted from the fifteen hundred dollars, so placed in his hands, the unpaid balance of the respondent's bill against the complainant for services, to wit, seven hundred and twenty-five dollars, and that he had paid the remainder, to wit, seven hundred and seventy-five dollars to said Martha J. Magill, Augusta Palmer, and Mary E. Kelly, to be applied on account of their legacies; that the complainant has never given permission to

28

the respondent to use said fifteen hundred dollars in any other manner than for the specific purpose for which the same was placed in the respondent's hands. The complainant asks this court to make an order requiring the respondent at once to refund to the complainant said sum of fifteen hundred dollars.

This complaint, in accordance with the rules of court, was referred for examination and report to the standing committee on complaints against members of the bar, composed of five members of the bar appointed by the court. The committee on complaints has heard the parties and their witnesses, has made report to the court, and has filed with its report a transcript of the testimony given before it. The parties have been cited before the court and have been heard in regard to the action to be taken upon said report.

(1)     It appears by reference to the transcript of testimony that the respondent had been acting as attorney for the complainant for some time prior to September 27th, 1909; that on that day the complainant placed fifteen hundred dollars in the hands of the respondent for the purpose of paying off the three legacies aforesaid; that it was the expectation of both the complainant and the respondent that said fifteen hundred dollars would be paid over to the three legatees within a few days. The respondent did not open a separate account for said money at the bank, but deposited the same in his own bank account; and notified the three legatees that he had received said money for them. After this deposit the balance of the respondent's bank account at all times exceeded fifteen hundred dollars up to the time, three days later, when the complainant, as the respondent claims, directed him to take from said fifteen hundred dollars the amount of his fee for services. In these circumstances we do not think it fairly can be said that the deposit of said fifteen hundred dollars to his private account at bank, amounted to a conversion of the same by the respondent. Within a few days after receiving said fifteen hundred dollars, the respondent became dissatisfied with the complainant's conduct and notified the complainant that he would no longer act as complainant's attorney. The dissatisfaction came about

in the following manner: The complainant as executor of the will of Mary E. Holden, before consulting this respondent, had given a bond to the Probate Court to pay debts and legacies. After the engagement of the respondent as his attorney, the complainant represented to the respondent that the estate of Mary E. Holden was insufficient to pay the legacies and requested the respondent as his attorney to state that fact to the various legatees of Mrs. Holden and to endeavor to induce each of them to accept a sum less than the amount of his or her legacy named in the will and to release the executor. The complainant engaged the respondent to thus deal with the legatees rather than to act for himself as he was not on good terms with his relatives, the legatees, while the respondent was possessed of their confidence. The respondent acted as requested by the complainant and entered into negotiations with the legatees for a release of the complainant upon the payment of less than the full amount of the legacies. The complainant settled with one legatee upon the payment of eighteen hundred dollars upon a two thousand dollar legacy, with three other legatees having five hundred dollar legacies upon the payment of four hundred and fifty dollars each. There is no reason to question the good faith of the respondent in making these representations-to the legatees at the request of the complainant. The respondent testified that at the death of Mrs. Holden, he had supposed that her estate was sufficient to pay the debts and legacies in full. This supposition was based entirely upon his opinion that his aunt was a very conservative woman and would not be likely to make bequests in excess of her property. The respondent, however, had no knowledge of the extent of Mary Holden's estate, and had no reason to doubt the truth of the complainant's statement as to the insufficiency of the assets, until the happening of the occurrences which caused the respondent to cease to act as attorney for the complainant. One of the legatees, a Mrs. Whitaker, resided in Fall River, in the Commonwealth of Massachusetts; the amount of her legacy was two thousand dollars; the respondent was on friendly terms with Mrs. Whitaker and had negotiated with her but was unable to

obtain from her an agreement to accept less than the full amount of her legacy. On Sunday, September 26th, 1909, the complainant himself, without the knowledge of the respondent, went to Fall River and obtained a release from Mrs. Whitaker, in which it was recited that the release was given upon the payment of eighteen hundred dollars. In fact, the complainant paid to Mrs. Whitaker the full amount of the legacy with interest at four per cent. per annum for three years, amounting in all to the sum of twenty-two hundred and forty dollars. In the course of this transaction as reported by Mrs. Whitaker to the respondent, the complainant slandered the respondent by making derogatory statements regarding his character and also stated to Mrs. Whitaker in the presence of others that the respondent had nothing to do with the estate whatever; that he had never been employed as attorney by the complainant and was not to be considered at all in the settlement of the matter. The complainant requested Mrs. Whitaker to keep secret the facts of the transaction. On the Wednesday following (September 29th, 1909), however, Mrs. Whitaker came to Providence and disclosed to the respondent, and also to the three legatees aforesaid, the details of the transaction between herself and the complainant. The three legatees refused to accept the fifteen hundred dollars in the respondent's hands in payment of their legacies. In the hearing before the bar committee the complainant admitted that he paid Mrs. Whitaker the sum of twenty-two hundred and forty dollars and took from her a release on its face for eighteen hundred dollars or, as it appears in the transcript of testimony, for nineteen hundred dollars. He refused to state what object he had for doing so. Also he does not deny that he concealed from his counsel the amount that he had paid to Mrs. Whitaker. The complainant, however, denied that he had slandered the respondent in Fall River. The respondent at once, according to his testimony, went to Fall River and verified the statements of Mrs. Whitaker by the affidavits of the witnesses to the transaction of September 26th, between Mrs. Whitaker and the complainant. He became satisfied that Mrs. Whitaker's report was true and, as he claims,

in a state of indignation at the disloyal manner in which he had been treated at once, on September 30th, 1909, the day after the matter was first brought to his attention, wrote a letter to the respondent. As it has been urged that the contents of this letter indicate an improper attempt on the part of the respondent to intimidate and coerce the complainant, it is quoted here in full:

"PROVIDENCE, R. I., September 30th, 1909.

*"Mr. Wilton E. Peirce, Executor of*
*Mary Holden, late of Providence, deceased,*
*No. 1363 Park Avenue, Cranston, Rhode Island.*

"SIR:—In view of what occurred at Fall River, Mass., Sunday, September 26th, A. D. 1909, in connection with a settlement made by you, as Executor of the estate of Mary Holden late of Providence, deceased, with Harriet R. H. Whitaker wife of John W. Whitaker late of Fall River, Mass., deceased, all of which is well known to you, together with the malicious and slanderous statements made by you at that and other times in regard to me, directly and personal; I hereby notify you that I this day sever my connection with you as counsel to you in your capacity of Executor of the estate of Mary Holden late of Providence, deceased, after having been employed by you for the past three years.

"Enclosed you will find my bill for services, together with the credit. The balance you will pay immediately, or I shall take proper methods to collect it, I also notify you that I shall hold you responsible in damages for the injury to me resulting from your false, malicious, and slanderous words uttered concerning me.

"The check made by you payable to Harriet R. H. Whitaker for twenty-two hundred forty ($2240) dollars, came into my hands yesterday, September 29th, 1909, with her endorsement. It was afterward endorsed by me and deposited to my credit, as you will see when the check is returned to you. I have paid her the Twenty-two hundred forty ($2240) dollars in cash and have her receipt for it. The legacy paid for by this check from

you was for two thousand ($2,000) dollars, made to John W. Whitaker, the husband of Harriet R. H. Whitaker, and I am informed that the release which you hold in settlement is for nineteen hundred ($1900) dollars. You probably had a reason for using that amount instead of the twenty-two hundred forty ($2240) dollars.

"However, inasmuch, as you at first represented to me, and I, in your behalf, stated to some of the legatees, that the estate could not pay the legacies in full; and afterwards, when they demanded that the legacies should be paid in full and that you should render an accounting, you then instructed me to inform them that you would pay the full amount of the legacies, providing that they did not insist upon an accounting; you then on Sunday, September 26th, 1909, paid Harriet R. H. Whitaker the sum of Two hundred forty ($240) dollars in addition to the Two thousand ($2,000) dollars which was the amount of the legacy to her husband, John W. Whitaker, I now, as counsel in behalf of Martha J. Magill and Augusta Palmer, both of the town of Cranston in the county of Providence and State of Rhode Island, and Mary E. Kelly, of the City, County and State of New York, make a demand upon you for the interest at six per cent. per annum on their legacies of Five hundred ($500) dollars each for the three years last past. This matter must be settled immediately, or I shall proceed to have a citation issued in the Probate Court of Providence, to compel you to render an accounting.

" Yours truly,

" HENRY A. PALMER."

This letter notified the complainant that the respondent would cease to act as his counsel and informed him of the reason; it enclosed a bill for services and demanded immediate payment. It informed the complainant that if said bill was not paid, proper methods would be taken to collect it. It also notified the complainant that he would be held responsible in damages for the slanderous words uttered concerning the respondent. It also notified the complainant that the respondent had become counsel against the estate for the three legatees.

There can be no impropriety in the notification of this engagement, the propriety of the engagement itself will be considered later.

In this letter we fail to see the wicked intention of intimidating the complainant that has been urged to us. It does not conclusively indicate an attempt to coerce the complainant. The letter is perfectly consistent with the desire of an angry man to express to the complainant the indignation which the respondent felt towards him. On the following day, October 1st, 1909, the complainant came to the respondent's office and an interview was held between them. The respondent claims that in the course of this interview the complainant agreed to the amount of the respondent's bill for services, terminated the trust under which the respondent held the sum of fifteen hundred dollars, directed the respondent to apply a sufficient portion of said sum to the payment of the respondent's bill for services and to pay the balance to the three legatees and promised to bring to the respondent enough money to pay the three legacies in full with interest for three years. In regard to this interview and the settlement which the respondent claims was made at that time it is urged that by intimidation, oppression, and threats of a suit for slander the respondent forced the complainant to submit to his terms. Unless the circumstances of the interview clearly and conclusively establish such oppression the court should not so find in this extraordinary proceeding which looks to a summary order, and concludes the rights of the respondent without the ordinary procedure in legal controversies between citizens. If it is clear that the agreement was forced from the complainant it should not be allowed to stand, but if we must reach the conclusion upon conjecture alone, then this matter, as other issues between the parties, should be left for determination to ordinary legal proceedings. The complainant himself does not claim that he was intimidated at this meeting, for he denies that any such agreement was made. It does not appear that the respondent sought the interview, but that the complainant, after receiving the letter of the day before, of his own motion, came to the

respondent's office and desired a conference for the purpose of making a settlement. It is admitted by the complainant that the respondent refused to talk with him alone and that when a witness was called in the respondent warned the complainant that whatever he said might be used against him. The complainant does not contradict the respondent's testimony that early in the interview he told the complainant that he preferred to talk with an attorney rather than with the complainant himself. It is plain from the testimony that the respondent was angry with the complainant and told him very freely and forcibly what he thought of his, the complainant's, conduct. It is also clear that, in reply to the complainant's inquiry as to terms of settlement, the respondent repeated the statements of his letter, demanded the payment of his bill for services in full and the payment of the legacies of the three legatees, with interest, and reiterated that he intended to sue the complainant for his slanderous words. It is also clear that he absolutely refused to compromise these matters with the complainant, that he did not seek to prolong the interview or to obtain a settlement, that he did not threaten to bring the suit for slander unless his claim for services was paid, but so far from using that possible suit as a means of obtaining a settlement of his bill he repeatedly stated that even if his claim for services was paid in full, he should still bring the suit in slander. In these circumstances it does not appear that a termination of the trust and a direction to pay the respondent's bill was forced from the complainant by intimidation, and was not his voluntary action, in accordance with what he, at that time, considered to be just, unless a construction unfavorable to his good faith is to be placed upon every act and word of the respondent. An examination of the testimony of the complainant indicates that he was of ordinary intelligence and education. He was a cousin of the respondent and had been intimately acquainted with him for years. He was present before the court in chambers and appeared to be a strong man in the prime of life; there is nothing to suggest that he is a person susceptible to intimidation or coercion. As yet there has been no determination of the reasonableness of the

respondent's claim for services. That matter must be left, in the first instance, to another tribunal. As yet we are not justified in assuming that in obtaining a direction for the payment of his bill the respondent was receiving any advantage from the complainant, or more than his due. At the time of this interview the relation of attorney and client had ceased between these parties and a reading of the testimony clearly shows that no confidential relation existed between them or any relation of good will which gave to the respondent an influence over the actions of the complainant. Surely this respondent should not be charged at the same time with obtaining the direction for the payment of his claim by intimidation and threats and also by the exercise of the subtle influences which arise from the relations of confidence and good-will existing between the parties as attorney and client. The close scrutiny which the law makes of the transaction between counsel and client does not lead to a presumption of unfairness on the part of the attorney when he obtains the voluntary payment of a just claim for professional services.

In support of his testimony, the respondent introduced that of Miss Bessie Tennant, a stenographer employed in a neighboring office, who was called in as a witness to the interview. Miss Tennant testified that the complainant said that the respondent's bill "was perfectly all right," and that he was willing to settle the bill, that the complainant and respondent then went out into the hall-way and continued the conversation there, that she was going into her own office "and stopped a minute." In her testimony before the committttee, she can not remember distinctly whether at that time in the hall-way she heard the complainant tell the respondent to deduct his bill from the amount of money in his hands or whether the respondent came into her office and told her so, but she remembers that she heard it on that day. Later Miss Tennant wrote a letter to the committee in which she says that she has thought the matter over carefully and states: "After Judge Palmer had told Mr. Peirce that he was through with him, I left Judge Palmer's office and came into Mr. Gardner's office. Judge

Palmer came in with me as far as the inner door and then went out. He met Mr. Peirce in the hall again, and when I heard them talking I went out. I then heard Mr. Peirce say to Judge Palmer: 'You take your bill out, and I will bring in the balance Tuesday.'" The committee did not reopen their hearings, and though they attached this letter to their report, the complainant had no opportunity to cross-examine Miss Tennant upon the matter contained in the letter and we shall not consider this letter as a part of the case or as having any bearing upon its determination.

Against this testimony of the respondent and his witness is that of the complainant alone. He admits that an interview took place between himself and the respondent on October 1st, 1909, and that the respondent's witness was called in, but denies that he directed the application of any portion of the fifteen hundred dollars to the payment of the respondent's bill, or that he approved of the amount of the respondent's claim for services.

The respondent has been a member of this bar for a number of years; so far as it has been brought to the attention of this court, his practice has been without complaint or adverse criticism. His conduct before the court has always been marked by apparent truthfulness and good faith. On two occasions the respondent has appeared before the court and has been examined very thoroughly by members of the court in regard to matters relating to this transaction and his bearing has been frank and honest throughout. Miss Tennant appears to have been careful in her statements before the committee and to be entitled to credence as to those matters of which she has testified positively. Without placing any discredit upon the complainant the court must say that from the testimony given before the committee it can not be considered as established that the respondent holds the seven hundred and twenty-five dollars remaining in his hands for the specific purpose for which it was originally placed there. With the matter in that condition, this court, following its former decisions, will not exercise its summary jurisdiction but will leave the complainant

to pursue his ordinary remedy at law. This opinion is not intended in any way to be a reflection upon the action or the judgment of the committee on complaints, the members of which committee appear to have very carefully conducted their examination and made their report, but this is in accordance with the determination of this court, frequently expressed in the past, and is for the protection of the legal rights of the respondent.

This court has held that it will in a proper case make a summary order against a member of the bar, but it will do this only when it can not reasonably be disputed that there has been misconduct on the part of the attorney. The court said in *Orr* v. *Tanner*, 12 R. I. 94: "Some of the facts alleged by the complainant are denied by the respondent, but we think the undisputed facts in this case are sufficient to justify and require us to make an order against the respondent."

In *Burns* v. *Allen*, 15 R. I. 32, in considering the question of the interference of the court between attorney and client, the court said, in regard to the nature and extent of such interference: "It does not undertake primarily to settle the rights and credits of the parties, but only to require that its officers do not make illegal exactions nor deny to clients their indisputable rights. A jury is the tribunal to settle what is fairly due to the parties under their contract. Except incidentally, the court does not touch that matter in a proceeding like this, but simply acts with reference to an excess so apparent as to amount to misconduct." And in making its order in that case, the court said: "Under the circumstances, we think that thirty per cent. of the judgment is, certainly, as much as could be claimed, for all services that the respondent had the right to charge for, and that he should pay over all that he holds above that limit." In that case the court held as a matter of law that the respondent had misconceived the persons against whom he should make charge for certain professional services performed by him. The respondent had charged all these services to the complainant and had held a certain judgment, obtained for the complainant, in payment for all these services which

had been rendered largely for persons other than the complainant. The court did not assume to determine what would be proper compensation for the services rendered to the complainant, but found that thirty per cent. of the judgment would surely cover the amount and left the parties to their ordinary remedies as to the exact amount of compensation. The remaining seventy per cent., which was held by the respondent through a mistake of law, was ordered paid over as clearly held improperly.

In *Windsor* v. *Brown*, 15 R. I. 182, the court said: "When an officer of the court withholds funds unconscionably, or to an amount clearly above any legal claim, the court, not undertaking to settle the exact sum that may be due but to enforce good faith and fair dealing, will require its officer to pay so much as is beyond dispute."

(2) In no case does it appear that the court has exercised this jurisdiction except as to matters about which there was no reasonable dispute. The transcript of testimony taken before the committee shows that while the respondent was acting as attorney for the complainant money was placed by the complainant in the respondent's hands for a specific purpose. He could not apply it to any other purpose without the leave of the complainant. If no such permission or direction was given by the complainant, the respondent's duty was clear. If he failed in that duty the court without hesitation would exercise its authority and order him to apply the money in accordance with the trust. The respondent claims, however, that the trust was terminated and that he was directed by the complainant to make other application of the money, which he has done. In our opinion the testimony substantially supports the respondent's claim. In any view there is presented a reasonable dispute, and as to this disputed question the lawyer stands as does any other citizen and his rights should not be concluded by a summary order against him.

The complaints which are most frequently presented to the court by clients, asking that orders be made against attorneys directing them to pay over money in their hands, are in

cases where the attorney has retained money collected for the client, where the attorney has taken it as payment of his professional fee, or for some other reason has refused to pay it over to the client.   But the principles which govern the action of the court in those cases are equally applicable to any case where a summary order is sought.'   They arise from the nature of the proceeding.   The court, in the exercise of its control over attorneys, will not suffer a manifest injustice on the part of such officers to go uncorrected, and at once, in such a case, without requiring the injured party to resort to the ordinary procedure of the courts, this court will direct its officers to take such action or to make such payment as justice plainly requires.   It makes no difference whether the money has been collected by the attorney for the benefit of the client or whether, as in this case, it has been placed in the hands of the attorney by the client for a specific purpose.   If it is beyond reasonable question that there has been misconduct on the part of the attorney in retaining the money the court will promptly make an order for its payment.   But, alike in all cases, for the client to be given this extraordinary relief it must be clear that there has been an injustice done to him.   In all cases the client has relief in the ordinary tribunals for the determination of legal controversies, and when his right to have a summary order can be reasonably questioned he must be referred to these ordinary remedies, whatever be the nature of the controversy.

As some uncertainty exists as to the nature of the investigation of the committee upon complaints and as to the scope of its authority, it is advisable that its jurisdiction should be more particularly defined than it has been in the rules of court. The committee on complaints is simply a body which this court has created to assist it in the investigation of complaints against members of the bar.   The court can not delegate any of its own powers to this committee.   The court can not empower this committee to compel the attendance before it of parties or witnesses; and the court can not empower this committee to administer a binding oath to those who do appear before it. Even with its restricted authority, however, the committee, in

the practical operation of the plan, has been of the greatest assistance to the court through the investigation which it has made of complaints, and by the reports which it has rendered to the court.   Complainants, who desire to press their complaints, naturally have appeared before the committee and produced their testimony; respondents have availed themselves of the opportunity to appear before a committee of their fellow practitioners and answer the charges which have been made concerning their professional conduct, and by the reports of this committee of members of the bar of high standing the court has been greatly aided in deciding whether to take action upon charges preferred or to leave the complainants to their ordinary remedy at law.   But the report of this committee can never be used as the basis of an order against an attorney either for the payment of money or for his discipline.   Its only proper use is as the report of a preliminary investigation made to determine if the matter calls for a hearing before the court.   The power to discipline members of the bar lies in the court alone, and when the court is to exercise the extraordinary power of summary proceeding against a member of the bar there should not be a master, or committee, or other tribunal standing between the court and the parties and witnesses.   A summary order should be made with the greatest caution, and only after the parties and the witnesses have appeared and given their sworn testimony before the court itself.

In this proceeding the complainant and the respondent stand in altogether different positions.   The complainant, if it clearly appeared that he is entitled to relief, would be granted an order in his favor; if his right is not manifest, his complaint is dismissed, but entirely without prejudice to his right to prosecute his claim in the ordinary way as he must in his disputes with others not members of the bar.   He is deprived of no legal right, all rights of trial given to others are preserved to him.   The court has simply refused to give him an order against one of its officers, an order which it will only grant, when in the exercise of its discretion the case clearly appears to require it. In regard to the respondent, however, if an order is made against

him, it is a final determination of his rights. Hence, the court will grant such an order with the greatest caution.

In this case, upon the coming in of the committee's report, both parties were cited before the court. At the hearing the complainant and his attorney were given an opportunity to be heard as to the action which should be taken by the court., If the complainant had desired to present further testimony or to further examine the respondent, he surely would have been permitted to do so by the court. The complainant gave the court to understand that he desired to submit his case upon the report of the committee and the testimony presented before the committee. The complainant has never suggested to the court, and the court has no reason to believe, that his testimony before the court would be more favorable to him than his statement made before the committee. The court ordered a second hearing before it for the further consideration of the conduct of the respondent in the premises, and notice of said hearing was given to the attorney for the complainant and a copy of the specifications of misconduct upon which the respondent was to be heard was given to said complainant's attorney, and the complainant would have been permitted to take part in said hearing if he had desired to do so.

In the complaint before it, the majority of the court is of the opinion, as a result of the preliminary investigation by the committee, that the complainant should be remanded to his ordinary remedy and that the complaint should be dismissed without prejudice; and it is so ordered.

(4) There remains to be considered that portion of the report of the committee upon complaints in which the attention of the court is called to the conduct of the respondent in undertaking to act as counsel for Martha J. Magill, Augusta Palmer, and Mary E. Kelly, legatees under the will of Mary E. Holden, and against the complainant as executor of said will. The respondent was not justified in thus acting as counsel against the complainant in the same general matter in which he had before been engaged in behalf of the complainant; as, however, the slightest word of public censure from the court may be very

injurious to the reputation and to the future professional career of the respondent, our disapprobation of his conduct should be accompanied with a statement of the circumstances in which he accepted this engagement against his former client, as those circumstances appeared in testimony at a hearing before the court. This complainant, the respondent and the three legatees named are cousins, and the late Mary E. Holden, was an aunt of each of them. Each of the said three legatees are widows. The relation between these ladies and the respondent had always been intimate and friendly, and the respondent's position as counsel for the complainant appears never to have been regarded as one adverse to the interests of said legatees.

The respondent has testified that the report of Mrs. Whitaker as to the transaction, which took place between herself and the complainant, had enraged him against the complainant. Whether rightly or wrongly, the three legatees and the respondent, as a result of Mrs. Whitaker's report, thought that the complainant had deceived them and the respondent considered that he had been used as a tool to deceive those who placed confidence in him. In these circumstances, and on their solicitation, the respondent took up the cause of his three cousins for the purpose of compelling the complainant to pay the full amount of their legacies, with interest, which they then became convinced the estate was sufficient to enable him to do. The impulse which led the respondent to take the claims of his three widowed cousins against the complainant was perhaps a natural one, although the engagement was one which the law will not permit.

The respondent acted openly; there was no attempt on his part secretly, and for his own advantage, to aid the adversaries of his former client; he was not trafficking in his former client's interests or using against the complainant any confidence which had been disclosed by him or any knowledge which the respondent had gained while acting as attorney for the complainant. For as such attorney he had gained no knowledge as to the condition of the Holden estate which would assist him in prosecuting the claims of his three cousins against said estate.

Any knowledge as to the condition of the estate and its ability to pay the legacies with interest was not gained by the respondent as attorney for the complainant but was acquired by the respondent and the three legatees from the disclosure of Mrs. Whitaker. It was not acquired confidentially from the former client, but contrary to that client's intention. The respondent, by reason of his former relations with the complainant, was no better prepared to prosecute these claims against the complainant than was any other attorney at the bar. But nevertheless he had acted as attorney for the complainant in the settlement of this estate. The rule as to the conduct of attorneys in this regard knows no exception; the respondent had acted as attorney for the complainant in this matter and he can not be permitted now to place himself in a position hostile to his former client. We would insist upon the strictest compliance with the rule requiring loyalty on the part of an attorney to the interests of his client. The relation of attorney and client in this respect has been fully considered in the case, *In re Boone*, 83 Fed. Rep. 944. In that case the court said, at page 952: "Of course, it is conceded that an attorney may represent his client's adversary with perfect propriety whenever their interests are not hostile to each other. The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection. *Price* v. *Railroad Co.*, 18 Ind. 137; *Bent* v. *Priest*, 10 Mo. App. 543. An attorney can not use the knowledge acquired confidentially from his client in trafficking with his client's interests. *Hatch* v. *Fogerty*, 40 How. Prac. 492. This general and well-settled rule is not found in any positive enactment. Indeed, none is necessary; it springs from the very nature and necessities of the relation of attorney and client, and finds its highest sanction in the confidential char-

acter of that relation. No rule in the ethics of the legal profession is better established nor more rigorously enforced than this one. The relation of attorney and client is one of mutual trust, confidence, and good will. *Arrington* v. *Sneed*, 18 Tex. 135. The attorney must use all the care, skill, and diligence at his command on behalf of his client. The relation being, in the highest degree, a confidential one, he is bound to the strictest secrecy and the most scrupulous good faith. He is not allowed to divulge information and secrets imparted to him by his client or acquired during their professional relation, except, perhaps, in very rare circumstances, or when authorized to do so by the client himself. This is the privilege of the client, and not of the attorney, and, unless the client sees fit to waive his privilege, the obligation solemnly rests upon the attorney to keep his lips forever sealed, and to preserve inviolate the confidence reposed in him. The relation may terminate, but the obligation nevertheless continues."

In *U. S.* v. *Costen*, 38 Fed. 24, Mr. Justice Brewer, then circuit judge, said: "It is the glory of our profession that its fidelity to its client can be depended on; that a man may safely go to a lawyer and converse with him upon his rights, or supposed rights, in any litigation, with the absolute assurance that that lawyer's tongue is tied from ever disclosing it; and any lawyer who proves false to such an obligation, and betrays, or seeks to betray, any information or any facts that he has attained while employed on the one side, is guilty of the grossest breach of trust. I can tolerate a great many things that a lawyer may do,—things that, in and of themselves, may perhaps be criticised or condemned,—when done in obedience to the interest or supposed interest of his own client, and when he is seeking simply to protect and uphold those interests. If he goes beyond, perhaps, the limits of propriety, I can tolerate and pass that by; but I cannot tolerate for a moment, neither can the profession, neither can the community, any disloyalty on the part of a lawyer to his client. In all things he must be true to that trust, or, failing it, he must leave the profession."

In *U. S.* v. *Costen*, *supra*, the respondent, after acting as

counsel for certain litigants, ceased to so act and then secretly sought to sell his knowledge of important facts, acquired during his employment, to the other side. In *re Boone, supra,* the respondent had appeared for a client for at least seven years in long, continuous, and arduous litigation involving a large number of suits at law and equity, affecting the validity of certain inventions and patents belonging to his client. He then withdrew and sought to be employed by the other side, and urged as a ground for employment that he was possessed of knowledge that would be important to the litigation which he had gained during his connection with the litigation acting for his former clients. In each of these cases the respective respondents were disbarred. We approve the doctrine in the two cases cited, but we can readily distinguish the facts of those cases from the facts of the case at bar, and we can discriminate between the action which this court should take in regard to this respondent and the penalty which was so reasonably imposed upon the respondents in those cases. This respondent was led by his indignation, and his desire to prevent what he considered the perpetration of a wrong against these women, to assume a position which the law and the rules of his profession do not permit him to occupy and from which he must withdraw.

Our order is, that the respondent at once cease to act as attorney against the complainant as executor of the will of Mary E. Holden, in any manner, either directly or indirectly, and that in any proceeding against said complainant as said executor which may be pending in any court and in which the respondent appears as attorney, he at once withdraw his appearance as such attorney.

Johnson and Parkhurst, JJ., concur.

DUBOIS, C. J., dissenting. I find that I am unable to agree with the majority of the court in the present case.

I am of the opinion, that, while ordinary disputes between counsel and client concerning the apportionment of funds in the hands of the attorney must be determined in the usual manner like other disputes, a consideration of the circumstances sur-

rounding the present dispute is sufficient to differentiate it from a mere controversy over the amount of the attorney's fee, or the value of his services to be deducted from the fund in question, and to warrant the disciplinary action of this court in respect to one of its officers. The circumstances referred to consist of the admitted facts; that the attorney had not only ceased to act for the complainant but was acting for his adversaries and was using against him the knowledge obtained while in his employ, and was holding over him the prospect of a slander suit in which the attorney was to be the plaintiff. Such condition of affairs was unfavorable to the client, and gave him no opportunity to calmly consider his rights in the premises, and a settlement arrived at on such an occasion should be scrutinized closely. If the counsel obtained an unfair advantage of his former client in such a manner, he should not be permitted to retain it.

I am of the opinion that the conduct of the attorney in attempting to represent the legatees after he had been counsel for the executor of the estate, was highly improper and should be punished.

I am also of the opinion that the settlement made as claimed by the counsel should not be permitted to stand, and that the respondent should be required forthwith to repay to the complainant the sum of $725 with interest from October 1st, 1909, and also be required to withdraw from all future participation in the prosecution of claims against the estate of Mary E. Holden, of which the complainant is executor.

BLODGETT, J., dissenting. I am unable to agree with the opinion of the majority of the court in this case.

I dissent from that opinion, firstly, because the complainant has not been permitted to present his complaint to this court or to any body or tribunal competent to administer an oath and the charge of the misappropriation of trust funds by the respondent of which he has been found guilty by the bar committee, has been determined adversely to the complainant and the finding of the bar committee has been reversed without hearing

the complainant before this court and without legal evidence of any nature in his behalf. Secondly, because it appears from the respondent's own statements that a clear case of undue influence and even of oppression and intimidation has been presented calling for the summary action of the court; and, lastly, because the gravity of his offence is not adequately punished by permitting the respondent to retain for his own use one-half of a trust fund placed in his hands by the complainant as his attorney for the payment of the legacies of his widowed cousins and by then requiring him to cease his endeavors to make restitution therefor by legal proceedings against the complainant, coupled with an apology for "the slightest word of public censure from the court," and an eulogy of his professional career.

It therefore becomes necessary to state at some length, certain facts not mentioned in the majority opinion. On October 12, 1909, the following complaint was filed in the office of the clerk of this court:

"*To the Honorable, the Supreme Court of the State of Rhode Island:*

"Wilton E. Peirce, of the town of Cranston, in the county of Providence and State of Rhode Island, complains to Your Honors of Henry A. Palmer, Attorney and Counsellor at Law, of said State, and showeth unto Your Honors as follows:

"*First:* That he, as executor of the will of Mary Holden, late of Providence, deceased, employed the said Henry A. Palmer to act for him as attorney in his said capacity. That he has paid to the said Henry A. Palmer sums more than sufficient to cover all reasonable charges which he could possibly make for services rendered in behalf of your complainant.

"*Second:* That on September 27, '09, he placed in the hands of the said Henry A. Palmer as his counsel, Fifteen Hundred Dollars ($1500.00) for the specific purpose of settling three legacies of $500.00 each due to Martha J. Magill, Augusta Palmer, and Mary E. Kelly.

"*Third:* That the said Palmer on September 30th, 1909,

wrote a letter to your complainant stating that he severed his connection as counsel for your complainant in his said capacity, and sent to your complainant a bill for One Thousand Dollars ($1,000.00) for services and credited him with $275.00 already paid and made a demand upon him for the payment in full, with interest, of the legacies of the said Martha J. Magill, Augusta Palmer and Mary E. Kelly. That on October 7th, 1909, the said Palmer informed your complainant by letter that he had deducted from the $1,500.00 placed in his hands as aforesaid, the balance of his bill, to wit, $725.00, and enclosed a receipt for the same and stated that the said Martha J. Magill, Augusta Palmer, and Mary E. Kelly had accepted the balance of said $1500.00 to be applied on account of their legacies.

"*Fourth:* And your complainant hereby alleges that said $1500.00 was given for the specific purpose of settling said legacies and that he never gave permission that the same should be used in any other way, and that in equity and justice said $275.00 heretofore paid to the said Palmer would more than compensate him for all services which he has performed for your complainant in his said capacity.

"Wherefore your complainant prays that this Honorable Court may make an order requiring the said Henry A. Palmer, to at once refund to your complainant said $1,500.00 placed in his hands as aforesaid, and to make such further orders in the premises as to Your Honors shall seem meet.

" WILTON E. PIERCE."

This complaint was referred, under the rule, to the committee on complaints against members of the bar, who, on December 28, 1909, made the following report to this court:

"STATE OF RHODE ISLAND

" *To the Honorable Supreme Court:*

*In re Complaint of*

*Wilton E. Peirce,*

*vs.*

*Henry A. Palmer.*

"REPORT OF COMMITTEE ON COMPLAINTS AGAINST MEMBERS
OF THE RHODE ISLAND BAR.

"The committee on complaints respectfully report unto your honors that they met at the office of Archibald C. Matteson Esq., one of said committee, at 912 Banigan Building, on Friday October 29, 1909, and on Monday, November 1, 1909, for the purpose of considering the above matter.

"All the members of the committee were present at both hearings.

"Both complainant and respondent were represented by counsel, the complainant by Edward D. Bassett, Esq., and the respondent by James J. McCabe, Esq. Both complainant and respondent were present in person and testified. The respondent also offered in evidence the testimony of his stenographer, Miss Bessie Tennant.

"It was admitted by both parties that the sum of $1,500, mentioned in said complaint, was placed in the hands of the respondent as counsel for the complainant for the specific purposes of paying the same in sums of $500 each, to Martha J. Magill, Augusta Palmer and Mary E. Kelly in settlement of their claims as legatees under the will of Mary Holden.

"It was claimed, however, by the respondent that a subsequent agreement was reached at a meeting in his office on October 1st, that so much of the sum of $1500, as was necessary to pay the balance of his bill as rendered, or amount claimed by him as due for professional services, of $1,000, might be used for that purpose.

"The committee are unanimously of the opinion that no such subsequent agreement was reached between said complainant and said respondent as to any other disposition of said sum of money; that said respondent, in appropriating a part of said sum to the payment of his own bill for legal services as counsel for said complainant, was guilty of a breach of trust and should be required either to use the same for the specific purpose for which it was given him or return the same to the complainant; and inasmuch as the respondent has ceased to act as attorney

for the complainant and is acting for the three legatees before mentioned this committee recommends that the respondent be ordered to pay the balance of said $1500, not paid over in accordance with the terms of the trust, namely, $725., to the complainant forthwith.

"The committee further wish to express their disapproval of the respondent's conduct in ceasing to act as counsel for the complainant and undertaking to act as counsel for creditors of the estate without notice to and consent of the complainant.

"The finding of the committee makes it unnecessary for them to consider the propriety of the bill for services rendered by the respondent.

"A transcript of all the testimony accompanies this report.

"Respectfully submitted,

"ARCHIBALD C. MATTESON,
"THEODORE FRANCIS GREEN,
"PATRICK P. CURRAN,
"ROYAL H. GLADDING,
"JAMES C. COLLINS, JR.,

*Committee.*"

"Since the writing of the above report, the letter, which is hereto attached, was sent to the Secretary of this Committee by Miss Bessie Tennant, the witness introduced by the respondent at the hearing. A majority of the Committee think that if the witness were re-examined, and she should testify to the facts stated in her letter, it would not change their conclusions. One member of the Committee, however, thinks that the statements of Miss Tennant in the letter, if true, would establish the agreement between the respondent and the complainant, but would not lead him to approve the conduct of the respondent in the premises. He would still think that the fee charged by the respondent is exorbitant and that his conduct in undertaking the prosecution of claims against this estate, after having

represented the estate, under the circumstances set forth in the testimony, is open to the censure of the Court.

                          " ARCHIBALD C. MATTESON,
                          " ROYAL H. GLADDING,
                          " PATRICK P. CURRAN,
                          " THEODORE FRANCIS GREEN,
                          " JAMES C. COLLINS, JR.,
                                              *Committee.*"

The letter above referred to is as follows:

                                    "November 12th, 1909.

" JAMES C. COLLINS, JR., ESQ.,
    " No. 15 Westminster Street,
        " Providence, R. I.

" DEAR SIR:—At the hearing of Henry A. Palmer before the Bar Committee, I testified that, I had either heard Mr. Wilton Peirce tell Judge Palmer to take his bill out of the fifteen hundred ($1500) dollars, and that he would bring in the balance due on the legacies, or else Judge Palmer had told me this. In thinking this matter over carefully I find that I was mistaken.

" After Judge Palmer had told Mr. Peirce that he was through with him, I left Judge Palmer's office, and came into Mr. Gardner's office. Judge Palmer came in with me as far as the inner door and then went out. He met Mr. Peirce in the hall again, and when I heard them talking I went out. I then heard Mr. Peirce say to Judge Palmer: 'You take your bill out and I will bring in the balance Tuesday."

                          " Very truly yours,

                                    BESSIE TENNANT."

Upon the presentation of said report, citation was issued to the respondent to appear before the court on January 22 ;1910, "then and there to be heard in regard to the action to be taken on said report;" and at that time and for that purpose only, and not for the taking of any testimony, both parties and their counsel appeared. For the first time it is now determined by this court that a hearing before the court is requisite before an

order is made against an attorney in a case like the one at bar, and that statements against an attorney made before the bar committee are not legal evidence justifying such action.    At the time of this hearing no intimation was given by the court that any change would be made in its former practice and that the practice since followed would then be adopted; nor was it suggested to either party that the court desired evidence under the sanction of an oath upon the matters referred to in the report of the bar committee.

Although the committee on complaints has no authority to administer an oath, no evidence was then offered to the court, and the respondent and his counsel addressed the court upon the single question of the adoption, modification or rejection of the report and recommendation of the bar committee, and without any legal evidence thereon, as now determined, a majority of the court have determined the issue of the misappropriation of the trust fund adversely to the complainant and have reversed the finding and report of the bar committee as appears by the following rescript filed on March 9, 1910, viz.:

"As to the prayer of the petition that a summary order be made against the respondent directing him to pay over to the complainant the fund originally placed in the respondent's hands for the purpose of making certain payments to legatees under the will of Mary Holden, a majority of the court is of the opinion, that a reasonable dispute exists between the parties as to the respondent's duty to pay over said fund; that the complaint should be dismissed and the complainant should be remanded to his ordinary remedy at law or in equity. Opinion will be filed later.

"As to the other matters contained in the report of the Committee upon Complaints, the court will hear the respondent on Saturday, March 19, 1910, at ten o'clock, A. M."

The specifications upon which the respondent was to be thus heard were as follows:

In *re Peirce* v. *Palmer*.    "On Saturday, March 19th, 1910, at 10 o'clock, A. M. the court will hear the respondent in regard to his conduct in undertaking to act as counsel for Martha J.

Magill, Augusta Palmer and Mary E. Kelly, legatees under the will of Mary E. Holden, without notice to or consent of the complainant. Also at that time the court will hear the respondent upon the following matters: It is thought by one member of the court that the respondent should be required to explain his conduct, that it may appear that he acted in good faith, in depositing the fund of $1500, received by him for a special purpose, to his individual account in bank and made no entry upon his books showing that said fund was held in trust; also in making representations to legatees under the will of Mary Holden, that the estate was insufficient to pay their legacies in full. Bertram S. Blaisdell, Clerk."

A copy of the foregoing notification thus addressed to the respondent alone and not to both parties was sent by mail by the clerk to the counsel for the complainant and to the respondent in person and on the last named date the respondent and his counsel appeared in response thereto, and the complainant not being present nor represented, the respondent was sworn and testified at length relative to the matters above referred to in said rescript.

In the majority opinion it is stated: "But the report of this Committee can never be used as the basis of an order against an attorney either for the payment of money or for his discipline. Its only proper use is as the report of a preliminary investigation made to determine if the matter calls for a hearing before the court. The power to discipline members of the bar lies in the court alone, and when the court is to exercise the extraordinary power of summary proceeding against a member of the bar there should not be a master, or committee or other tribunal standing between the court and the parties and witnesses. A summary order should be made with the greatest caution and only after the parties and the witnesses have appeared and given their sworn testimony before the court itself." But the right of a complainant upon whom rests the burden of proof, if the law be as thus declared by the majority opinion, is certainly no less in this respect than is the right of the respondent. Certainly, too, in a case where the bar committee

has found the complaint to be established, the right of the complainant to offer testimony to the court itself and the duty of the court to hear such testimony before dismissing a valid complaint is equally indisputable and a right which is a shield for the accused must be equally available as a sword in the hand of his accuser. The majority of the court have decided in *favor* of the respondent the issue referred to in the rescript, *supra,* entirely upon the proceedings before the bar committee, which proceedings the majority opinion holds do not constitute legal evidence against the respondent sufficient to justify an order against him, and have reversed the finding of the bar committee sustaining the charge of the complainant.

Believing and averring that he has been wronged by an officer of this court, the complainant has sought relief from this tribunal. The bar committee, though having no authority to administer an oath, have heard the statements of the respective parties and have reported in his favor for the further investigation and action of this court. Without one word of evidence given under the sanction of an oath, and without any hearing of testimony thereon by the complainant or in his behalf by this court, upon the mere statements made before that committee, the finding of the committee is reversed and his petition is denied and dismissed, and the principle is adopted and established, that the requirements of the law in this respect for the attorney are not the requirements of the law for the client.

The dispute between these parties is of relative unimportance when compared with the appalling consequences which must ensue upon adopting and adhering to this fundamental error in procedure by the court of last resort.

But even if the complainant be entirely eliminated from the enquiry, nevertheless the statements and testimony of the respondent himself disclose facts not only justifying but imperatively requiring the summary action of the court in this respect. On this phase of the case it appears to me that the opinion of the majority misconceives the issue raised, misapprehends some of the respondent's statements and overlooks certain others of his statements. All the cases heretofore

decided by this court, and relied on in the majority opinion are cases where the amount due the attorney for his services was the matter at issue, as appears from the statement of them in the majority opinion. But that question is not the gravamen of the present complaint, and none of those decisions applies to the present case. The respondent here stands charged, not indeed with the crime of embezzlement, but with an unauthorized and hence illegal conversion and misappropriation of a trust fund placed in his hands as counsel for the complainant for a specific purpose and for no other purpose. The method in which it is alleged to have been so misappropriated, to wit, by a conversion of a portion of it to his own use, is indeed specified, as it properly should be specified, in order that the respondent may have notice of the charge against which he must defend. And secondary to the principal charge of misappropriation, and as a further notice to the respondent that his right to convert the same to his own use was denied, there is indeed an averment that he had already received certain sums "more than sufficient to cover all reasonable charges which he could possibly make for services rendered in behalf of your complainant." The concluding paragraph of the complaint and the prayer for relief are as follows:

"*Fourth:* And your complainant hereby alleges that said $1,500.00 was given for the specific purpose of settling said legacies and that he never gave permission that the same should be used in any other way, and that in equity and justice said $275.00 heretofore paid to the said Palmer would more than compensate him for all services which he has performed for your complainant in his said capacity.

"Wherefore your complainant prays that this Honorable Court may make an order requiring the said Henry A. Palmer to at once refund to your complainant said $1,500.00 placed in his hands as aforesaid, and to make such further order in the premises as to Your Honors shall seem meet."

The prayer of the complaint is not at all that this court shall determine the amount of the compensation due the respondent, but that the respondent may be required to return the whole

trust fund to the complainant. The report of the bar committee carefully observes this distinction and finds the respondent "guilty of a breach of trust" and that he "should be required either to use the same for the specific purpose for which it was given him or return the same to the complainant." The committee expressly decline to consider the question of the compensation due the respondent, adding further: "The finding of the Committee makes it unnecessary for them to consider the propriety of the bill for services rendered." If the respondent had applied the trust fund in question to the payment of certain enumerated debts of the estate instead of to the purposes for which the trust was originally admittedly created, precisely the same issue of a breach of trust and misappropriation of the fund would be presented as is presented on this record. The fact that the respondent appropriated the fund to himself instead of to the payment of other specified creditors of the estate in certain amounts, merely strengthens the reason for the summary action of the court against its officer but does not essentially change the issue presented. The issue here presented must not be lost sight of or confounded with the question of the amount of compensation due the respondent, which, of course, cannot be determined in this proceeding, even if such a determination was sought by the petitioner or had been included in the report of the bar committee.

The relation existing between attorney and client with reference to trusts created between them is thus stated by Mr. Justice Story, in his work on Equity Jurisprudence, under the heading 'Constructive Fraud," § 310, as follows: "In the next place, as to the relation of client and attorney or solicitor. It is obvious that this relation must give rise to great confidence between the parties, and to very strong influences over the actions and rights and interests of the client. The situation of an attorney or solicitor puts it in his power to avail himself not only of the necessities of his client, but of his good nature, liberality, and credulity to obtain undue advantages, bargains and gratuities. Hence the law, with a wise providence, not only watches over all the transactions of parties in this

predicament, but it often interposes to declare transactions void which between other persons would be held unobjectionable. It does not so much consider the bearing or hardship of its doctrine upon particular cases, as it does the importance of preventing a general public mischief which may be brought about by means, secret and inaccessible to judicial scrutiny, from the dangerous influence arising from the confidential relation of the parties. By establishing the principle that while the relation of client and attorney subsists in its full vigor the latter shall derive no benefit to himself from the contracts, or bounty, or other negotiations of the former, it supersedes the necessity of an inquiry into the particular means, extent and exertion of influence in a given case; a task often difficult, and ill-supported by evidence which can be drawn from any satisfactory sources. This doctrine is not necessarily limited to cases where the contract or other transaction respects the rights or property in controversy, in the particular suit in respect to which the attorney or solicitor is advising or acting for his client; but it may extend to other contracts and transactions disconnected therefrom, or at least where from the attendant circumstances there is reason to presume that the attorney and solicitor possessed some marked influence, ascendency, or other advantage over his client in respect to them."

Thus, misconceiving the issue, it follows that the true rule of law, which is that the burthen of proof in such cases is always on the attorney and not on the client, is also erroneously stated. That rule is thus stated in section 311 of the same work, as follows: "On the one hand it is not necessary to establish that there has been fraud or imposition upon the client; and on the other hand it is not necessarily void throughout, *ipso facto*. But the burthen of establishing its perfect fairness, adequacy, and equity is thrown upon the attorney, upon the general rule that he who bargains in a matter of advantage with a person placing a confidence in him is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential relations with each other. If no such proof is established, Courts of Equity treat the case as one of constructive fraud."

To the same effect are many adjudicated cases, all of which establish the same requirement in dealings by an attorney with a client to the advantage of the attorney, and covering a wide range of transactions.   Thus, in the recent case of *Phipps* v. *Willis*, 53 Ore. 190 (1909), affirmed on rehearing, it is said (p. 194): "Owing to the necessary confidential relations existing between an attorney and his client, and to the influence growing out of such fiduciary positions, courts, both of law and equity, especially the latter, scrutinize most closely the transactions between them.   It has accordingly become well settled that, to enable an attorney, in a dealing of advantage to himself with his client, to maintain such transaction, the burden is upon him of showing, not only that he used no undue influence in respect thereto, but gave to his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the client received the same consideration and benefit as if he had dealt with a stranger," citing cases.

"In *Ah Foe* v. *Bennett*, Mr. Justice Moore, in considering this point, observes: 'In a suit by a client, to be relieved from an engagement into which he had entered with the attorney, he is not compelled to show that there has been any imposition or fraud; for, if the transaction complained of be one in which the relation between the parties could have exerted any influence in the attorney's favor, the burden of establishing its perfect fairness is cast upon him.'"

In *Howell* v. *Ransom*, 11 Paige, Ch. Rep. 538, 540, it is said by Chancellor Walworth: "From the relation of attorney and client, which existed between the complainants and the defendant Ransom, it was not necessary for them to prove actual fraud, on the part of the latter, in obtaining an assignment of their judgment for about one-tenth of its actual value, including the interest which was due thereon at the time of such assignment.   It is a case of constructive fraud, which relieves the clients from the burthen of proving that their attorney intentionally deceived them, or made any misrepresentation whatever in relation to the value of the judgment, or the probability

of its collection. And, if the court is not bound to set aside the sale as a matter of course, upon the application of the client, in such a case, the whole burthen of establishing the fairness of the sale, and that it was made upon a full or adequate consideration, is at least cast upon the attorney."

And in the recent case of *Thweatt* v. *Freeman*, 73 Ark. 575 (1905) it was held (pp. 578, 579): "It is not difficult to find in the books a plain declaration of the duty owing by an attorney to his client and the principles governing the dealings between them. . . . The doctrine is more concisely stated by a modern author as follows: 'Equity regards the relation of attorney and client much in the same light as that of guardian and ward, and will relieve a client from hard bargains or from any undue advantage secured over him by his attorney. And the client, in order to secure such relief, is not bound to show that there has been any imposition or fraud, nor is the transaction necessarily void; but if it is a transaction in which the relation between the parties exerted, or might reasonably have exerted, any influence in the attorney's favor, then the burden of establishing its perfect fairness is thrown upon the attorney,'" citing cases.

"In the last case cited (*Thomas* v. *Turner*, 87 Va. 1), it is said: 'It is the duty of an attorney to give his client the benefit of his best judgment, advice, and exertion, and it would be a just reproach to the law if he were permitted to bring his own personal interest into conflict with that duty by securing a benefit to himself through the influence which the relation implies. All transactions between the parties, to be upheld in a court of equity, must be *uberrima fides*, and the *onus* is on the attorney to show, not only that no undue influence was used, or advantage taken, but that he gave his client all the information and advice as against himself that was necessary to enable him to act understandingly. He must show, in other words, (1) that the transaction was perfectly fair; (2) that it was entered into by the client freely; and (3) that it was entered into with such a full understanding of the nature and extent of his rights as to enable the client to thoroughly comprehend the scope and

effect of it.   Or, as Lord Eldon tersely puts it in the famous case of *Huguenin* v. *Basely*, 14 Ves. 273, the transaction must be shown to have been the "pure, voluntary, and well-understood act" of the client's mind, otherwise a court of equity will undo it as having been unduly obtained.'"

So in *Kidd, Executrix,* v. *Williams*, 132 Ala. 140 (1901), it is determined, pp. 143-4,—"The principle in all our cases is, that while the confidential relation lasts, and as to its subject-matter, there must be no abuse of confidence with respect to it, by which the attorney secures an unjust advantage over the client.   It is easy to see, that in such time, and as to the business in which he is employed, the attorney could make unfair and unconscionable demands to which the client would yield, although he regarded them unjust, out of the fear of the consequences of a refusal, or from the attorney's undue influence over him; but, when the business is over, and the client, being *sui juris*, and fully informed as to the business transacted, and is on equal terms and dealing at arm's length with the attorney, voluntarily stipulates with him for compensation for his services which have been rendered, we are not aware of any principle on which such settlement can be properly set aside by the client, on the ground that he did not have competent and independent advice in making such settlement. . . .   The rule, even when the relation exists, is well expressed,—sustained apparently by numerous cases,—in 3 Am. & Eng. Ency. Law (2nd ed.) 334, as follows: 'An attorney is under no actual incapacity, however, to deal with or purchase from his client; all that can be required is, that there shall be no abuse of the confidence reposed in him, no imposition or undue influence practiced, nor any unconscionable advantage taken by him of the client.   As has been stated, in a transaction of this character, the burden is upon the attorney to show its perfect fairness; but if the court is satisfied that the party sustaining the relation of client, performed the act or entered into the transaction voluntarily, deliberately, and advisedly, knowing its nature and effect, and that no concealment or undue means were used to secure his consent to what was done, the transaction will be upheld.'"

Again, the rule is thus stated in *Barrett* v. *Ball*, 101 Mo. App. 288, 310: "The rule is well settled that there is no class of transactions respecting which courts of equity are more jealous, or scan more critically than dealings between clients and attorneys, and where an attorney bargains with a client to his own advantage, it devolves upon the attorney to show that he fully and faithfully discharged his duties without misrepresentation or concealment of any material fact, and the client was fully informed of the extent and character of his rights and interests in the subject-matter of the transaction and the effect of the contract, and so situated as to deal at arms-length with his counsel. That this doctrine is so well established as to require no authority in support, would doubtless be conceded by defendant, but its application herein is questioned as the existence of the relations of attorney and client between the parties was alleged to have ceased prior to the date of the transaction. But it has been well said that where a relation which presupposes an ascendant or controlling influence by one party on the mind of the other has existed, the influence acquired by such relation may extend more or less after the period of its termination, and when such is the case, the transaction will be scrutinized with the same jealousy as if the relation had continued. *Mason* v. *Ring*, 2 Abbotts' Prac. Rep. (N. S.) 322; s. c. 3 N. Y. Court App. 210."

And in delivering judgment in the House of Lords, in 10 H. L. Cases, 26, 43, it was said by Lord Chancellor Westbury: " My Lords, there is no relation known to society of the duties of which it is more incumbent upon a court of justice strictly to require a faithful and honourable observance, then the 'relation between solicitor and client.'"

So in *Mills* v. *Mills*, 26 Conn. 213, 219, it is said: "There are no transactions respecting which courts of equity are more jealous and particular than dealings between attorneys and their clients, especially where there is great intellectual inequality, and comparative inexperience on the part of the latter."

In *Brock* v. *Barnes*, 40 Barb. 521, it is said (pp. 532–3): " An attorney may bargain with his client, and an agent with

his principal, but in such case the attorney and agent, before he can enforce the agreement in his favor and for his benefit and advantage, must show that as regards that transaction he dealt with entire fairness and that no advantage was taken of his position. This is the doctrine of all the cases, both in this country and in England, and accords with that sound morality which forms the basis of an enlightened public policy."

So in *Felton* v. *LeBreton*, 92 Cal. 457, 469, the law is thus stated: "While an attorney is not prohibited from having business transactions with his client, yet, inasmuch as the relation of attorney and client is one wherein the attorney is apt to have very great influence over the client, especially in transactions which are a part of or intimately connected with the very business in reference to which the relation exists, such transactions are always scrutinized by courts with jealous care, and are set aside at the mere instance of the client, unless the attorney can show by extrinsic evidence that his client acted with full knowledge of all the facts connected with such transaction, and fully understood their effect; and in any attempt by the attorney to enforce an agreement on the part of the client growing out of such transaction, the burden of proof is always upon the attorney to show that the dealing was fair and just, and that the client was fully advised," citing cases.

Again, in *Condit* v. *Blackwell*, 22 N. J. Eq., 485, it is said: "This fiduciary relation thus existing between these parties, the validity of this transaction must be determined by rules of law which are not applicable to ordinary cases. The confidence which the relation of attorney and client begets between the parties, and the influence which the attorney thereby acquires, has led to a very close scrutiny of all transactions between them, and the law often interposes to set aside contracts which, between other persons, would be subject to no exception. In such cases the burden of establishing the perfect fairness, adequacy, and equity of the negotiation is thrown upon the attorney, and in the absence of such proof, courts of equity treat the case as one of constructive fraud."

In *Matthews* v. *Robinson*, 7 Kan. App. 118, 122, it is said:

"The rule laid down by the court is the ordinary rule between strangers, but it is not the rule applicable to dealings between attorney and client.  If there is a suggestion of unfair dealing upon the part of an attorney, the burden of proof is upon him to show the honesty and good faith of the transaction, and that it was entered into by his client freely and understandingly, and is not upon the client to show that he was induced to enter into it by the false statements of his attorney.  This rule applies to contracts for compensation as well as to any other contract between attorney and client respecting any matter in litigation or respecting anything in which the attorney is employed, and the attorney cannot make use of the relation between his client and himself to extort an unjust or unreasonable compensation.  Courts will grant relief from such oppression and confine the attorney to a reasonable charge for his services."

Again, in *Dunn* v. *Dunn*, 42 N. J. Eq., 431, 438, the law is thus declared:  "As I have said above, it is not on the ground of actual fraud that courts interfere, but simply because of the fiduciary relation that is shown to have existed, and it not being made to appear that the transaction, whether a gift or contract was perfectly fair and just.  Weeks, in his work on Attorney-at-Law, says: 'The rule is on the ground of public policy, not of fraud, and prevails although the attorney may be innocent of any intention to deceive, and act in good faith.'  And again—'Dealings between attorney and client are carefully and jealously regarded, particularly by courts of equity, to protect the client even from his own acts, if done under the influence or supposed ascendency which the attorney may have over him.  .  .  .  Such is the rule in these cases, than which no principle is more universally approved."

So in *Morrison et al.* v. *Smith*, 130 Ill. 304, 316, the same principle is affirmed: "The relation of attorney and client which existed between the appellants and appellee has always been regarded as one of special trust and confidence.  The law therefore very properly requires that all dealings between an attorney and his client shall be characterized by the utmost fairness and good faith, and it scrutinizes with great closeness

all transactions had between them. Meechem on Agency, §§ 877–879. So strict is the rule on this subject, that dealings between an attorney and his client are held, as against the attorney, to be *prima facie* fraudulent, that is to say, the burden is not upon the client to establish fraud and imposition, but the burden rests upon the attorney to show fairness, adequacy and equity."

In *Bingham* v. *Salene,* 15 Or. 208, 217, Lord, C. J. thus declared "as to the correctness of the principle so ably maintained by the counsel for the defendants in respect to the duties and obligations of attorneys to their clients, the measure of faith and diligence required of them, and the great jealousy with which the courts watch all transactions between them and the affirmative duty of the attorney to show that the transaction was fair and honest and above all suspicion—in a word, that the confidence reposed has not been betrayed—we heartily approve and indorse. The principle of a public policy, which affects with a presumption all transactions between persons standing towards each other in confidential relation, that an undue influence has been exercised, and which devolves upon him who occupies the post of active confidence to show that presumption adequately rebutted, is founded in the soundest judicial wisdom."

In *re Darlington's Estate*, 147 Pa. St. 624, the Supreme Court of Pennsylvania affirmed in *re Greenfield's Estate*, 14 Pa. 489, in which later case the court said, p. 631, "In this feature the case presents what is called constructive fraud, springing from the confidential relations existing between the parties. This peculiarity, withdrawing it from the operation of ordinary rules, throws upon the beneficiaries the duty of showing expressly that the arrangement was fair and conscientious, beyond the reach of suspicion. In requiring this, courts of equity act irrespective of any admixture of deceit, imposition, overreaching, or other positive fraud. It is founded upon a motive of general policy, and is designed to protect a party, so far as may be, against his own overweening confidence and self-delusion, the infirmities of a hasty judgment, and even

the impulses of a too sanguine temperament. It has been beneficially applied to those confidences which owe their birth to the relation of parent and child, guardian and ward, trustee and cestui que trust, and, above all, attorney and client. To guard against the strong influences which these connections are so apt to originate, the law not only watches over the transactions of the parties with great and jealous scrutiny but it often declares transactions absolutely void, which, between other parties, would be open to no exception. This is emphatically true of the relation of client and attorney, and to persons standing in a situation as *quasi* guardians or confidential advisers. Many of the cases establish the doctrine that, while these connections exist in full vigor, the adviser shall take no benefit to himself from contracts or other negotiations with the advised."

In *French* v. *Cunningham*, 149 Ind. 632, the Supreme Court of Indiana approves the language of the Supreme Court of Alabama in *Dickenson* v. *Bradford*, 59 Ala. 581 (p. 637): "In *Dickenson* v. *Bradford, supra,* the court said: 'Having entered upon the duties of the relation without a contract stipulating the measure of compensation, the appellee and his partner had no other legal claim on the appellant, than the right to demand of him reasonable compensation for their services. If the contract subsequently made stipulates for a greater compensation, it cannot be supported, unless it affirmatively appears that there is an absence of undue influence, and the best evidence of its absence, would be that the attorneys gave to their client the information and advice, which it would have been their duty to give, if the client had been dealing with a stranger, conferring on him the same rights and advantages, on the same considerations, which the contract confers on them.'"

In *Jones* v. *Byrne*, 149 Fed. Rep. 457, 464 (1906), it is said: "Let us consider the law governing the relation of attorney and client, and of trustee and *cestui que trust* when dealing with each other as to the subject matter of the litigation or trust while those relations subsisted. In 4 Cyc. at page 960, the author says: 'Owing to the confidential and fiduciary rela-

tion between an attorney and his client and to the influence of the attorney over his client growing out of that relation, courts of law, and especially of equity, scrutinize most closely all transactions between an attorney and his cilent. To sustain a transaction of advantage to himself with his client, the attorney has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger.' In note 81, same page, it is said: ' It is obvious that this relation must have given rise to great confidence between the parties, and to a very strong influence over the actions and rights and interests of the client. The situation of an attorney or solicitor puts it in his power to avail himself, not only of the necessities of his client, but of his good nature, liberality, and credulity, to obtain undue advantages, bargains, and gratuities. Hence, the law, with a wise providence, not only watches over all the transactions of parties in this predicament, but it oftens interposes to declare transactions void which, between other persons, would be held unobjectionable.' Story Eq. Jur. Par. 310 (quoted in *Gruby* v. *Smith,* 13 Ill. App. 43, 45.). See also, *Gray* v. *Emmons,* 7 Mich. 533, 548.

"The text is sustained by the decisions of 15 states and the federal court."

So in *Merryman* v. *Euler,* 59 Md. 588, 591, it is held: "All the authorities concur that the highest degree of fairness and of good faith is required from an attorney towards his client, and all their dealings will be closely scrutinized, and no contract between them will be upheld where any undue consequences result to the attorney. Weeks on Attorneys-at-Law, 441, 450, and 451; Story, Eq. Jur. §§ 312a, 312b, 312c, and authorities there collated; and Kerr on Fraud and Mistake, 151, 161, 163, 168. The attorney is supposed to have an ascendency over the client, because of his relation to him, and can easily impose on his credulity; therefore, transactions, which would be open to no objection where no such relation exists, will be held invalid

.as against a client. It is a rule of public policy. _Gray, et al._
v. _Emmons, et al._, 7 Mich. 533; _Brown_ v. _Bulkley_, 1 McCarter
·Chy. 14 N. J. 451."

And finally, without further citation, the rule is thus forcibly
·stated in _Burnham_ v. _Heselton_, 82 Me. 495, 499, as follows:
·" The law hates fraud or deception of any kind. It will unhold
no contract or seeming right, obtained through fraud. When
the parties to the contract are upon equal footing, each dealing
for himself, without any relation of trust or confidence between
them, the law will not permit any misleading, any deception of
·one party by the other. It will not enforce any advantage so
gained. But in such cases the law will not presume there was
fraud. It will assume that each party acted for himself, upon
his own judgment without being misled by the other party, until
·such misleading is proved. Any such party, seeking to avoid
.any contract or other transaction on the ground of fraud, has
the burden of proving the fraud. Such transactions are pre-
·sumed to be valid, until proved to be invalid.

" When, however, the parties are not upon an equal footing,
·each acting for himself, but some relation of trust or confidence
·exists between them, touching the subject matter of the con-
tract, the law is not so considerate or trustful. Where such
relations exist, it views the transaction with caution, if not with
·suspicion. In such cases, it will not assume in favor of the
agent, or fiduciary, that the contract was fairly made, and that
there was no abuse of confidence. It waits for such party to
satisfy it affirmatively,—to affirmatively show that there was
in fact no abuse of confidence,—that this contract was in
fact fairly made,—that the other party was in truth made
acquainted with all the material facts and reasons known to the
fiduciary. The very making of the contract is incongruous,—
_prima facie_ inconsistent, with the fiduciary relation. The
transaction may be valid, but there is no presumption in its
favor. The presumption is of invalidity, which can only be
·overcome, if at all, by clear evidence of good faith, full knowl-
·edge, and of independent consent and action. Pom. Eq. Jur.
§ 945, 957, Adam's Eq. § 61, and notes; Story Eq. Jur. § 310.

"Especially does the law require the highest degree of honor and good faith, from its own ministers. It insists that the confidence of the suitor in the faithfulness and disinterestedness of his attorney and counsellor, shall be fully deserved. It deprecates any purchase of any matter of litigation by an attorney from his client. It greatly desires that the attorney should be satisfied with a reasonable compensation, without seeking to obtain speculative bargains from his client. As said by one writer, such a transaction may be valid but it is presumptively invalid. Where any such bargain is made, the burden of sustaining it is on the attorney. No presumption will avail him. He cannot get behind the presumption of innocence, and await the coming of hostile evidence. He must be aggressive, and advance against the presumption of invalidity, and overcome it, if he can, by evidence of 'the perfect fairness, adequacy, and equity of the transaction,' and particularly must he show that his client was informed of all material facts known to himself. . . .

"We do not think the attorney had any such presumptions in his favor in this action. He was not on trial for any crime. He was not charged in the declaration with any fraud. The action was the equitable one of assumpsit for money had and received by him to his client's use. In defense, he set up a transaction with his client which the law does not favor, and holds to be *prima facie* invalid. It was the law, not the plaintiff, that charged the fraud. The character of this particular transaction, not that of the attorney, was in issue. The act, not the person, was then on trial. The character of the attorney might aid him as a witness, but it could not prove his case for him as a party. While one may invoke the presumption of innocence in negation, and wait for the prosecution to overcome it by evidence, he can not successfully invoke it in affirmation, as tending to prove any proposition cast upon him to prove. That presumption is a shield, not a weapon. To illustrate:— it is wrong not to pay one's promissory notes, and yet when one is sued upon such a note, and the note is produced, he cannot rely upon the presumption of his innocence of wrong, as proving or tending to prove payment of the note.

"As to the presumption of improbability,—the law says it is against the attorney,—that it is improbable that the client had the same knowledge, and stood on the same footing as the attorney. Hence the requirement that the attorney shall affirmatively prove these propositions."

But in the majority opinion it is said of the respondent's letter to the complainant: "It does not *conclusively* indicate an attempt to coerce the complainant," and again it is said, "Unless the circumstances of the interview clearly and *conclusively* establish such oppression the court should not so find in this extraordinary proceeding which looks to a summary order, and concludes the rights of the respondent without the ordinary procedure in legal controversies between citizens."

That an order requiring a repayment of the trust fund to the complainant in no way "concludes the rights of the respondent" is later shown. The erroneous statement as to the nature and the degree of proof required and upon whom the burden of proof lies, as above set forth, is the subject of present consideration. That the burden is upon the respondent, and not upon the complainant, is sufficiently shown by the authorities cited, but it is specifically maintained by the opinion of the majority that on the contrary the burden is upon the complainant and that the complainant must prove his case "conclusively" in this proceeding, although if the respondent were on trial upon an indictment for the embezzlement of this money, proof beyond a reasonable doubt would suffice.

Webster's Int. Dic. gives the following definitions:—"Conclusive evidence (Law) that of which, from its nature, the law allows no contradiction or explanation.—Conclusive presumption (Law), an inference which the law makes so peremptorily that it will not allow it to be overthrown by any contrary proof, however strong." And the word is thus defined by statute. Thus in *Moore* v. *Hopkins,* 83 Cal. 270, 272, there is cited the code of civil procedure of California, which is as follows—"Conclusive or unanswerable evidence is that which the law does not permit to be contradicted." And there is judicial authority for such a definition in the absence of statute. Thus, in *Hilliard*

v. *Beattie*, 58 N. H. 112, the court says: "'Conclusively' is defined by Webster as 'decisively,' with final determination. Decisively is defined by the same author, 'in a conclusive manner, to end deliberation, doubt or contest.'" Bouvier defines it as "that which cannot be disputed, that which cannot be contradicted by any other evidence." And in *Smith* v. *Rodecap*, 5 Ind. App. 78–80, it is said: "The word 'conclusively' carries with it the idea of finality and implies necessarily that the presumption is of such a character that no evidence may be considered to rebut it. See Anderson Dic. of Law, tit. 'Conclusive.'"

I dissent from both propositions.

Nor can I agree that certain conclusions of fact which are stated in the majority opinion are supported by the record. Thus in the majority opinion it is stated that "the complainant himself does not claim that he was intimidated at this meeting for he denies any such agreement was made." Inasmuch as no reference is made in this discussion to any statements said to have been made by the complainant against the respondent because statements against the respondent made before the bar committee do not have the legal weight of testimony under oath, it is only necessary to refer to the statement of the respondent in that behalf.

That the complainant was thoroughly alarmed and intimidated by the threats contained in this letter is clearly shown by the admission of the respondent in his statement in direct examination made before the bar committee: "Q. 18. When he came in there what was the conversation about?—This bill? A. I told him, I said, 'That letter speaks for itself and I have got through with you as counsel because of what you said of me in Fall River. Q. 19. What did he say in Fall River? Mr. Bassett: One minute——A. Then he asked me why I was getting through with him. He had always been kind to me, spoke of his great love for me as a cousin; for twenty-six years had been my bosom friend and boon companion; was perfectly willing to pay my bill; was willing to pay legacies with interest; and the only thing that worried him was the fact that

I had threatened to bring suit for slander against him and he reiterated that he had never said anything to the people in Fall River that would cast any reflection on me in the slightest way. He frequently reiterated that he wanted to pay me my claim as attorney and to pay the legacies, but he didn't want to pay for the slander and finally, during the time he was there before he started to go out, he said that he would like to know how much it would cost to straighten out for the slander and I said at that time I wouldn't talk about the slander or its consequences; that was an outside matter and I would have some attorney on the floor attend to that, that a man who was his own attorney had a fool for a client. But he constantly reiterated that everything was all right and satisfactory and he wanted to be good friends. . . . Did he say anything later to you about this bill? A. He did. Q. 21. What was that? A. After we had talked for some time,—I had talked to him with Miss Tennant there,—I finally told him I preferred to talk with an attorney rather than with him. Q. 22. What was your reason for that? . . . A. The reason I told him I would prefer to talk with an attorney was that it couldn't be said I was taking any advantage of him then. Q. 23. On that same occasion did you have any other conversation with him? A. I did. Q. 24. State what that was. A. After we had talked a great length of time I told him I had gotten through with him and he continued these appeals for recognition on the ground of relationship and reiterated that he was perfectly willing and wanted to settle my bill and to pay the balance on the legacies together with the interest of $500, for the period of three years. Then Miss Tennant and I left him at my door and Miss Tennant went into the next office and I started in with her and when I came out he was standing right at the door in the same place. Q. 25. What door was that? A. Right at the entrance to my door and also the entrance to Mr. Gardner's office next to mine, and that was the time that he again asked me, for the sake of the common blood running through our veins, or something to that effect, (extremely good blood) to settle the matter in full and for me—He says,

'You have the $1500, now you take your fee out of that and apply the balance to the legacies and I will bring in the money to make good the difference between the amount that you have taken out and what would pay them their $500, each with interest at the rate of six per cent. for three years.' He didn't say that exact thing about the rate of interest, but he said that because of the fact that he had paid one legacy he has spoken of, of $2240. At that time Miss Tennant—I don't know whether she was exactly on the spot, but five or six feet away, and at that time I said to him if he would bring in the balance before Tuesday of next week, I would do as he suggested on that and give him a release of all my claims against him, except the claim for slander and that I would not release him on. I would secure a release from the three legatees named and he said 'all right' and left me there and the next thing I heard from him was the letter from Mr. Bassett." On cross-examination the respondent was asked (p. 38): "Q. Of course the drift of the conversation was he was endeavoring to deprecate your wrath about this suit you threatened him with for slander? A. He came in like a weeping willow." If any doubt exists as to the mental condition of the complainant at this time, thus threatened with a suit for fees by the respondent, a second suit for slander by the respondent, and with proceedings in the probate court in the interest of the three legatees brought by the respondent already engaged as their counsel, as thus described with ill-timed levity by the respondent, such doubt is removed by the succeeding questions and answers: " Q. Seemed to be very much alarmed? A. Yes, he did. Q. That was the subject of conversation during the fifteen minutes? A. That formed a great part of it."

There is here the unqualified admission by the respondent that the complainant, who is described in the majority opinion as appearing to be "a strong man in the prime of life," and of whom it is further added, "there is nothing to suggest that he is a person susceptible to intimidation or coercion" was, as a matter of fact "very much alarmed" by the threats and conduct of the respondent at this interview. Were such a mental condition

testified to by the complainant, we might consider the state-ment, in view of his interest in the repayment of the money sought by this proceeding, but when it comes from the lips of the respondent, he certainly can not complain if it be accepted as true.

Moreover, the stenographer called by the respondent, also read before the bar committee, from her stenographic notes, certain memoranda of the conversation at this interview, of which certain extracts follow (p. 54): "Judge Palmer said, 'I have put my proposition up to you. The slander proceedings I shall put in the hands of a lawyer.'" (p. 55) "Then he (the complainant) said, 'I was forced in the matter. I haven't tried to do anything behind your back. I didn't go to Fall River until one thirty. My mother told me to do it.' (That was Mr. Peirce talking.) Then he says, 'Can I settle with you?' Judge Palmer says, 'I went to Fall River yesterday and got their affidavits and they are ready to go on the witness stand any time I need them.' Mr. Peirce says again, 'I didn't try to do anything behind your back.' Judge Palmer says, 'Why did you get another lawyer?' And Mr. Peirce said, 'I never have been to another lawyer or taken any one else's advice. I intended to do right.' Judge Palmer says, 'I will'— Mr. Peirce says, 'I will try to settle with you to the best of my ability.' Judge Palmer says, 'On my own proposition.' Then he says, 'If I settle with you will you bring the slander matter against me?' Judge Palmer says, 'Yes sir, I will.' He says, 'I don't say you have done wrong in bringing your bill as a lawyer; I do think it is wrong bringing the slander case against me. I have never done anything against you.' Judge Palmer says, 'Well, you can prove it.' Mr. Peirce said, 'I don't want any feeling whatever and I was going to try to make everything right. Well, what is the case for slander going to be for? How much?' Judge Palmer says, 'I will talk that over with my counsel.' 'I will say that I have never said such words against you in my life.' Judge Palmer said, 'You will have to decide whether three people are lying or you are. For my part I believe the three people.' Judge Palmer

said, ' If you want to accede to the demands I made in the letter
which I dictated to Miss Tennant and sent to you, you can
send me a check covering that amount and I will give you a
release covering myself and the three women.   The slander
thing is a separate case.   If you don't do this I will ask for an
accounting.   I will give you three or four days to think it over.
I will ask for an accounting of the estate.   I shall bring suit
for the slander.   The slander is a separate case and I will
employ an attorney to look after the matter for me and I will
let you know who the attorney is.'   Mr. Peirce says, ' I will
try to do my best for you as long as I can. · I never tried to
do anything behind your back.   You were to fix with the ten
people and I was to settle with you.'   Judge Palmer says, 'I
will give you until next Tuesday.'   Mr. Peirce says, ' On what?
On both of them?   I want to settle this matter between you
and I.   I want to settle with you on the slander business.
I don't want to have to go to court on that.   I simply say that
I never uttered such words against you and you can take my
word and my wife's for that.'   Judge Palmer says, ' You both
said it.'''

It is impossible to read these statements and escape the
conclusion that the complainant was thoroughly alarmed and
intimidated by the repeated threats of the respondent to in-
stitute a suit for an alleged slander of which the complainant in
vain protested his innocence, and for the institution of which
the respondent asserted he had already been to Fall River
and obtained the affidavits of certain witnesses.   It is not an
edifying spectacle to thus contemplate an officer of this court
intimidating a client until he reduces one of his own kin, who
for twenty-six years had been his bosom friend, to the humilia-
tion of imploring his own counsel "for the sake of the common
blood running through our veins" if he will not believe his
assertion of innocence, at least to desist from his threatened
course of procedure, only to have that appeal then contemp-
tuously disregarded and a month later to have himself with
equal contempt sneeringly described and characterized by his
counsel in the hearing before the bar committee as "a weeping

willow." Finally, in the respondent's own words (p. 33): "After we had talked a great length of time I told him I had gotten through with him, and he continued these appeals for recognition on the ground of relationship and reiterated that he was perfectly willing and wanted to settle my bill and to pay the balance on the legacies together with the interest of $500 for the period of three years." And as maintained by his witness (p. 55) "Mr. Peirce says, 'I will try to settle with you to the best of my ability.' Judge Palmer says, '*On my own proposition.*'" . . . "Mr. Peirce said, 'I don't want any feeling whatever and I was going to try to make everything right. Well, what is the case for slander going to be for? How much?' Judge Palmer says, 'I will talk that over with my counsel.'" It must not be overlooked here that the first requirement of "My own proposition," as thus expressed by the respondent, was set forth in his letter as follows: "Enclosed you will find my bill for services, together with the credit. The balance you will pay *immediately*, or I shall take proper methods to collect it."

An examination of the plan and purpose of the respondent's letter shows that it was written not merely to give a belated notice of the termination of former services, but to obtain money from the complainant first and "*immediately*" for himself for his services, next to obtain money from the complainant for the alleged slander, and last of all to obtain interest at six per cent. for three years on the legacies of his new clients, the face value of which legacies was at that moment in his hands awaiting their acceptance, although interest had been paid Mrs. Whitaker at four per cent. However indignant the respondent may have been when he first heard of the settlement on September 27, he represses all expression of indignation for three days, and on October 1, for the first time, mentions it. It is not unnatural to suppose that to an intimate cousin there would have been a request as to the truth of the statement made by Mrs. Whitaker immediately upon hearing of it, coupled with a demand for the retraction of the words if their utterance was admitted. But the respondent decides to at once demand

money therefor from the complainant, under threat of action if not paid, knowing that under the law of this State, without even affidavit of the truth of the utterance of the alleged slanderous statement, he could arrest the complainant, or if not arrested on original writ, that execution for any judgment which he might obtain would run against the body of his cousin. And this demand he includes in the same letter in which he for the first time discloses to his client the amount which he claims to be due for his services as counsel, and insists therein upon an "*immediate*" payment thereof. It is to be noticed, too, that he had been contented to serve his cousin for nearly three years, and until June 1909, without compensation, when he admits receiving $200 and $75 in the following August, and that he was not to be paid in full until after the estate was settled. The respondent's statement on these matters is as follows (p. 37): "And during the three years you had never received anything until June, 1909? A. No. Q. And then you received——A. $200.  $275, in all." (p. 40) "You never rendered him a bill for anything at all until you rendered him this bill? A. I did not because it was understood that when he settled up the estate I would be taken care of. He said that many, many times." That he intended to pay himself out of this fund in advance of any authority to do so and when he wrote his letter is shown by his retaining the money without justification and by his own testimony before this court (p. 6.). "Q. Why didn't you return this money to Mr. Peirce immediately upon severing your connection with him? A. I wrote for him to come into my office." . . "Q. You had no authority whatever upon anything apparently, to hold it one minute. A. I told him in the letter what I would do with it and he came in and ratified it within six hours." An examination of the letter shows that the real intent and purpose, thus inadvertently disclosed, was not expressed in any way in his letter. The highwayman who, with pistol levelled at the head of his debtor, commands him to "Pay me that thou owest," and thereby secures such a sum as contents him, no more deals

with a free moral agent than the respondent was dealing with a free moral agent at the close of this interview.

It is not unnoticed that the respondent avers that he said to the complainant he should institute a slander suit even if a settlement was made. The only comment which is warranted by the facts disclosed by the respondent as to the *bona fides* of the respondent in thus repeatedly threatening the institution of such a suit, is that so far from damaging him in the estimation of Mrs. Whitaker, she at once reported the alleged slander to him and came to him to cash the check given her by the complainant, as appears by the respondent's letter above quoted. The same letter shows that the three legatees therein named, after an interview with Mrs. Whitaker, at once employed him to represent their interests, and that he accepted their employment and at the hearing before this court the respondent testified that two other legatees "have come to me since this hearing, this original hearing before the bar committee and asked me to get the balance of their legacies and interest same as others here"—how many others the respondent does not state. To this statement should be added the further testimony of the respondent at the hearing before the court of March 19, 1910, and nearly six months after this interview, as follows: "Q. Did you ever bring any suit against him for the slander which you speak of in this letter? A. No sir. Q. Never did? A. No sir."

Inasmuch as the respondent's admissions show the state of fear and alarm to which the complainant had been reduced before he assented, as the respondent says, to the payment of the respondent's claim from the trust fund, it is evident that no such authorization even if made should for an instant be allowed to stand by this court, although the only advantage obtained by the respondent were the shifting of the burden of proof in any litigation which might hereafter be instituted for the determination of the amount of compensation to which the respondent may be entitled.

Again, it is stated in the majority opinion, "It does not appear that the respondent sought the interview but that the complainant, after receiving the letter of the day before, of his own

motion, came to the respondent's office and desired a conference for the purpose of making a settlement." The testimony of the respondent is as follows (p. 6.): "Q. Why didn't you return this money to Mr. Peirce immediately upon severing your connection with him? A. I wrote for him to come into my office."

The majority opinion states that "In support of the testimony of the respondent" that such an authorization was in fact made by the complainant "the respondent introduced that of Miss Bessie Tennant, a stenographer employed in a neighboring office who was called in as a witness to the interview.'"

. . "Miss Tennant appears to have been careful in her statements before the committee and to be entitled to credence as to those matters of which she has testified positively.'" What then is this witness' statement before the bar committee, and does her testimony support the respondent's contention? She then stated as follows, on Monday, November 1, 1909 (p. 51): "Q. Did he make any further statement with regard to the bill? A. Well, he said that he was willing to settle the bill and Judge Palmer said all right, he would give him four or five days to do it. That was all he had to say to him. Then they went outside when Judge Palmer said that was all he had to say. I was going into my own office and stopped a minute. They were conversing then and whether at that time Mr. Peirce told Judge Palmer to deduct his bill from the amount of money in the bank or whether Judge Palmer came in later and told me that I don't know. I don't distinctly remember, but I heard it on that day and I thought the matter had been settled and four or five days later the Judge came in with a letter from Mr. Bassett;" and later she testified (p. 57): "MR. COLLINS (of the Bar Committee): You made no memoradum— Witness: No, I did not. MR. COLLINS: I simply wanted to know if you testified from memory. WITNESS: I did not. As I told you, I wasn't sure whether I heard Mr. Pierce say it or Judge Palmer came in later and told me so. Nothing was said about it between the Judge and myself until last Friday and I said, ' Did you tell me that or did I hear Mr. Peirce say it?' Cross examination waived." The "last Friday" above re-

ferred to was Friday, October 29, 1909, which was the first day of the hearing before the bar committee and on which day the respondent had stated his version of the interview to the committee. The hearings before the bar committee were concluded on November 1, 1909. At that time it is manifest that the only witness called by the respondent, and who was specifically requested by him to be present at this interview between the respondent and the complainant and who was present in her capacity as stenographer and made stenographic notes of the conversation from which she read to the bar committee, not only had no stenographic note of the vital question at issue in this proceeding, but had absolutely failed to corroborate the respondent's contention, and cross-examination of such a witness was naturally and properly waived by the complainant. It is true that eleven days after the closing of the hearing on November 1, to wit, on November 12, 1909, the witness privately wrote a letter to the secretary of the bar committee, which is appended to their report, *supra*, in which she sought to retract her statement above made. But it is obvious that eleven days after the closing of a hearing, without notice to the complainant or knowledge of it on his part, and without opportunity afforded for cross-examination or for rebuttal, a retraction by a personal letter privately written and sent and not having even the legal weight of an *ex parte* affidavit, and changing a statement made on the vital question at issue by the only witness present, can not be considered for a moment by this court as amounting in law to a corroboration or "support" of the respondent's contention or as admissible in evidence in any way except as impeaching the credibility of the writer of the letter. But it is on precisely this foundation and no other foundation that the statement of corroboration or "support" in the majority opinion rests. It is no reflection on the integrity of this witness to say that her lack of observation at the time of the interview, the absence of all stenographic notes concerning this alleged settlement claimed by complainant, her uncertainty four weeks later, even after consulting with the respondent, and when she appeared before the committee,—

all these show that her memory is so defective in this respect as to make her statement of slight value even if it had been presented in such a way as to be legally admissible as evidence.

It is stated in the majority opinion that under the circumstances disclosed, "we do not think it fairly can be said that the deposit of said fifteen hundred dollars to his private account at bank amounted to a conversion of the same by the respondent." But all the facts relative to that matter are not set forth in the majority opinion. Even the respondent admits his act was a *prima facie* conversion. The respondent's statement on this matter is as follows (p. 48): "C. Q. 52. As to this $1500, I understand you to say that $1500, when paid, you deposited in the Westminster Bank? A. It was. C. Q. 53. And it remained there until what time? A. It remained there until some time after I had sent this letter. After I had the interview on the first of October. C. Q. 54. Deposited to your individual account, or personal? A. Individual."

(p. 39) "C. Q. 5. Did you on this date (October 1, 1909, the date of the interview with complainant) apply the $725? A. Well, I don't know as I did. I didn't change the money. I considered it in my possession. It was in my possession actually at that time. C. Q. 9. You didn't do it until after you wrote this letter did you? A. I have never changed the account since. C. Q. 10. You never deducted the $1500? It stands there now? A. I don't say that. I say as far as my bank account it was simply a mental transfer as the money was to my account in the bank." . . "C. Q. 12. Have you any items of this account? A. What do you mean? C. Q. 13. An ordinary account? A. No, I haven't. C. Q. 14. You made no charges? A. No. C. Q. 15. You have no books to show these credits that Mr. Peirce claims he is entitled to? A. No; if I had books that would not be on it that he paid me $275. C. Q. 16. Have you rendered him a bill for $275? A. No, sir, I have not. He has checks with my endorsement on it. C. Q. 17. You never rendered him a bill for anything at all until you rendered him this bill? A. I did not because it was understood that when he settled up the estate I would be taken care of.

He said that many, many times.   I could bring in his own
mother as a witness."   .   .   "C. Q. 42. Mr. Palmer, I was ask-
ing you a question about your charges and I think you said you
had no memoranda at all of any charge made during any period
you were acting as his counsel.   A. That is what I said.   C. Q.
43. That is a fact.   And then your fixing this sum which you
named to Mr. Peirce, a balance of $725, was done at the time you
mailed him in this letter?   A. Yes, the time I mailed the letter."

. . .

It is to be observed that the respondent on receipt of this
trust fund, on September 27, 1909, immediately mingled this
fund with his own money and made no entry even in his books
showing that the fund in question was held in trust, paid none of
the legatees anything therefrom until two weeks later, viz.,
October 11, 1909 (this proceeding being instituted immediately
thereafter on October 12, 1909), ten days after the interview
aforesaid and after first deducting his own claim therefrom.
The respondent did not return the complainant's money when
he wrote the letter of September 30, 1909, refusing to longer act
for him, and does not appear to have informed the complainant
that he could not complete the trust by reason of the refusal
of the legatees to accept the fund in question, and had already
so far converted the same to his own use that there remained but
a "mental transfer," as he expresses it, to complete the opera-
tion.

As the hearing before the court the respondent was unable to
give any reason for retaining in his hands the funds of $1500,
which he says the three legatees had each refused to accept
before he wrote the letter of September 30, 1909, because they
were entitled to interest on their several legacies, his testimony
being as follows:   "Q. You haven't answered me as to why,
when you wrote this letter of September 30th, you didn't en-
close your check for fifteen hundred dollars?   A. I didn't
think it was necessary."   The beneficiaries having, as he stated,
repudiated and renounced the trust, and he having severed
his connection as counsel for the complainant, and having ac-
cepted employment adverse to his former client, there was no

possible legal justification according to his own statement, for his retention of the fund in question. The only inference it is possible to draw is that he thus unlawfully retained this money for the purpose sufficiently outlined in his letter in which he says "Enclosed you will find my bill for services, together with the credit. The balance you will pay *immediately* or I shall take proper methods to collect it."

It is here to be observed that the majority opinion passes over in silence the respondent's conduct in retaining the $1500 in his hands, without so much as offering to return it, after he had notified the complainant he was no longer his counsel. There is no explanation of such conduct consistent with innocence.

While still holding this money as counsel for the complainant he secretly accepted the employment of those whose interests were adverse to his first client, and, more than this, he even retained, without shadow of pretence of lawful authority to do so, the fund placed in his hands by his former client and already mingled with his own moneys and undesignated on his books or otherwise as being other than his private property. At the hearing before the court the respondent sought to justify such mingling of funds by claiming it to be a common custom of other attorneys, although admittedly, he knew such action was a *prima facie* conversion (p. 20): "Q. You haven't answered me as to why, when you wrote this letter of September 30th, you didn't enclose your check for fifteen hundred dollars? A. I didn't think it was necessary. Q. Of course you know, Mr. Palmer, that when you take money for one purpose and put it in your books without specifying, it is *prima facie* conversion? A. It is done every day by nine-tenths of the members of the bar. Q. It doesn't change the rule of law. A. No, sir; I realize that."

In the majority opinion it is stated that on Wednesday, September 29, 1909, following the payment to Mrs. Whitaker on Sunday, September 26, the latter "came to Providence and disclosed to the respondent, and also to the three legatees aforesaid, the details of the transaction between herself and the com-

plainant. The three legatees refused to accept the fifteen hundred dollars in the respondent's hands in payment of their legacies." It is not disputed that the $1500 was paid to the respondent on Monday, September 27, 1909, and the respondent's testimony is that the three legatees were so informed on that day and declined to accept the same on that day (p. 16): "Q. And they came in to see you, you notified them the day you got the money it was there? A. Yes, sir, that night when I went home. Q. And they wouldn't take the five hundred dollars without the interest was added? A. Yes, sir." It also appears from the respondent's testimony that he knew of this settlement from both the complainant and Mrs. Whitaker on Monday, September 27 (p. 36): "Q. You got notice from both parties, Mrs. Whitaker and Mr. Peirce? A. Yes, Peirce told me this on Monday, after I had been notified by telephoning Mrs. Hattie Whitaker in Fall River, he said he had settled with Hattie Whitaker and it was subsequent to that time that Mrs. Whitaker came to my office with the check saying that she would not tell me the full amount he had paid her but she had a check from him and the amount was twenty-two hundred and forty dollars." . . . (p. 35): "Q. That was one of the things that made you angry? A. Yes, sir. Q. The fact that he *paid* twenty-two hundred and forty dollars, I say *that*, not that he paid her in full? A. The fact that he settled with her at all; yes, sir, I was to make all the settlements." The date of Monday, September 27, instead of Wednesday, September 29, is of importance only as showing the length of time during which the respondent deliberated upon his being "used as a tool to deceive those who placed confidence in him" before writing the letter in question terminating his employment after meanwhile accepting the employment of clients whose interests were adverse to the complainant.

And again, it is said in the majority opinion, "In this proceeding the complainant and the respondent stand in altogether different positions. The complainant, if it clearly appeared that he is entitled to relief, would be granted an order in his favor; if his right is not manifest, his complaint is dismissed, but

entirely without prejudice to his right to prosecute his claim in the ordinary way as he must in his disputes with others not members of the bar. He is deprived of no legal right, all rights of trial given to others are preserved to him." . . "In regard to the respondent, however, if an order is made against him, it is a final determination of his rights." The statement illustrates again the misconception of the issue involved in this case. It is not sought by this proceeding to determine the amount of the compensation to which the respondent is entitled, nor does an order of this court requiring him to repay this trust fund to the complainant in any way prejudice any right of action the respondent may have therefor, and it is literally true of the respondent, as well as of the complainant, "He is deprived of no legal right, all rights of trial given to others are preserved to him." He is simply prevented from helping himself to a trust fund in his hands, as attorney, and is required to prove his claim by action, if disputed, as he would be required to prove it by action if he had not paid himself from the money which chanced to be in his hands.

The majority opinion also avers that "At the time of this interview the relation of attorney and client had ceased between these parties," but it is not disputed that he still held the trust fund of $1500 as the attorney of the complainant. The testimony of the respondent is as follows (p. 7.): "Q. But you declined to act for him, you had severed all connections for reasons satisfactory to yourself? A. Well, in the letter I wrote, I asked him to come in." (p. 16): "Q. And they (the three legatees) came in to see you, you notified them the day you got the money it was there? A. Yes sir, that night when I went home. Q. And they wouldn't take the five hundred dollars without the interest was added? A. Yes sir. Q. Why, then, didn't you return the money at once to Mr. Peirce saying you were unable to complete the trust? A. Well, he was in there within six hours afterwards in response to my letter." And later on p. 24 he states: "There wasn't a difference of five working hours from the time he received the letter until he came in to see me." (p. 18): "Q. As a matter of fact you did not

pay this money to these three people until about the tenth of October? A. Some time after I got it for they had an idea if they accepted any of it they would be bound, and I told them they could accept that on account and when they found that out, why then they accepted it. They thought if they accepted any part it would be a waiver for the whole amount including interest." (p. 33): "Q. But when they (the three legatees) were offered five hundred dollars apiece they refused to take it? A. Yes, because they had been informed by this lady in Fall River that she had been paid the full amount of her legacy with interest for three years at five per cent. A. They came to you the day *before* you announced to them you had the money? A. Yes, that day she (Mrs. Whitaker) came up from Fall River and visited all our houses out there, visited one so that they all knew about it. They all live in this colony there together." In the respondent's statement to the bar committee he claimed that he was authorized to deduct the amount of his bill from the trust fund and was to distribute the balance among the legatees. He there stated as follows (p. 34): "Q. 26. Did you pay any money out on account of that subsequent agreement? A. I did, I took the $725 from the $1500 and distributed $258.33 to each one of the three legatees, which was one-third of the balance of $775 which was left. I have the receipts of two ladies, the third party was in New York, and I sent a certified check of the Westminster Bank and got a receipt that the check was paid by them." Receipts are offered in evidence and bear date of October 11, 1909. "Q. What was the time of that agreement? A. It was the day that he came in in response to my letter. Q. October 1st? A. October 1, 1909." Whether the negotiations with these three legatees, in behalf of the complainant, extending for ten days after the interview, and which were necessary because of their prior refusal of the face amount of their legacies and their fear that by accepting a partial payment they would waive their right to payment of all that was legally due them,—whether such negotiations were made by the respondent still holding the trust fund as the attorney of the complainant by virtue of his previous relation to the complain-

ant, or, if that relation be considered as terminated and at the interview held "five working hours" after the letter was received a new employment was then extended and accepted, is alike immaterial. The "relation of attorney and client" still indubitably existed.

As to the representations made by the respondent to certain legatees concerning the ability of the estate to pay the legacies in full, the majority opinion states that "There is no reason to question the good faith of the respondent in making these representations at the request of the complainant."

Upon that question the record is as follows: The respondent, while claiming that he has never known the exact amount of assets of the estate, nor whether the estate was sufficient to pay the legacies in full, admits, under oath before this court, that he made representations of insufficiency of assets to different legatees which he believed to be false when he made them, and attempted to draw a distinction between his knowledge as an attorney and as an individual, which is best expressed in his own language: "Q. When you got this fifteen hundred dollars and you were going to pay some legacies, you knew that he had settled with these four or five other people, you mentioned at a ten per cent. discount, did you not? A. Yes, sir; he gave me his reason for it. Q. What was that? A. He would rather pay them the full amount and not have any bother. A. There was not any bother to be had if the estate was insufficient to pay. A. Well, there never would have been any bother if he had rendered an accounting. Q. If the estate was in fact unable to pay in full he couldn't have been liable. A. No, sir; his conduct showed all the time to the people interested that the estate was able to pay and they always believed it was and believe it to-day. Q. What was your belief at the time you saw these people about settling their legacies and the fifteen hundred dollars was put in your hands, as to the ability of the estate to pay in full? A. Well, I didn't have any way of determining. I thought he had possession of the entire estate, he would know. Q. My question was what your belief was, whether you believed what he told you or did not believe

it? A. I did not; it was based entirely on hearsay testimony. Q. He had never represented this estate insolvent and was under personal bond to pay the debts and legacies? A. He said he would have to pare them down. Q. I don't quite understand your position with reference to these three ladies mentioned in the will here, five hundred dollars apiece for them, in representing to them a statement you did not believe to be true, his representations at that time. A. I simply represented to them what he told me was the fact. I was acting for him and I represented to them just exactly what he told me. Q. It seems by your statement to-day that you made representations to these legatees which at the time you did not believe to be true, about the ability of the estate to pay in full. A. I didn't have any way of determining, simply my personal opinion. This man represented that to be the exact condition of affairs and I expected he was in a better condition to know about it than I was. Q. When you made these statements to the legatees did you tell them that you knew or believed yourself that the estate was insolvent, or that he so represented to you? A. I told them, I simply quoted his words, that he couldn't pay the full amount of the legacies, that on the five hundred dollar legacies he could only pay four hundred and fifty dollars. Q. Did you base that statement at all upon your own knowledge? A. No, sir, I did not, simply on the statement he made to me. Q. Why did you believe the estate could pay in full? A. Well, I think my aunt was worth sufficient money at the time of her death to pay the legacies in full. Q. You mean with interest and all? A. Yes, sir. I believe that now. . . . Q. Do you consider it proper to take money and induce legatees to accept trust funds made under representations in the behalf of the client which you believe are untrue? A. Well, I didn't have any knowledge that was untrue, that was simply my personal opinion. As an attorney and counsellor at law I had no knowledge of that at all but as an individual outside I would have an idea."

Moreover, the respondent admits that he knew that the complainant had given a bond in the penal sum of $20,000 to pay

all debts and legacies and that under the decision of this court
in *Adams* v. *Probate Court of Central Falls*, 26 R. I. 239, and 27
R. I. 98, to which he refers, these legatees were amply secured
for the full amount of their several legacies with interest, irre-
spective of the amount of the assets of the estate. His ex-
planation is that certain legatees desired an accounting and
would then waive any deficiency. His testimony before the
court on this point is thus given: "Q. Then when he brought
this fifteen hundred dollars in for these three legatees, Mrs.
Magill, Palmer, and Kelly, he said he would pay them in full,
and get rid of them. Of course there could be no trouble if
his statement was correct. A. That remains to be proven.
Q. As a statement of fact, there would be no trouble if he did
not pay but four hundred and fifty dollars on the five hundred
dollars if the estate was not able to pay in full. A. It would
have been very easy for him to show that the estate could not
pay the full amount and they would all have been satisfied.
He was requested to do that and absolutely refused. Q. He
has given a bond to pay the debts and legacies; he is liable
whether the estate paid or not. A. That is my proceeding in
the probate court now. Q. If he saw fit to take a chance of
giving that kind of a bond the condition of the estate won't
excuse him. A. The decision of this court in the Central Falls
case fixes that. Q. Then you knew there was a legal right to
obtain it at the time you took this money to pay the debts and
legacies? A. These people said that if he could show them the
estate was insufficient to pay the full amount they would accept
the reduction. . . Q. You knew as his counsel they could
collect it all? A. Well, as long as these people were willing to
waive the full amount if he rendered an accounting, I don't see
why I, as his counsel, should insist upon his paying the full
amount because that bond was filed. Q. In this letter you
not only ask for the full amount of the legacies but ask interest
showing a change of opinion over night. A. My knowledge of
the law wasn't changed. I knew that they could recover the
full amount on that bond that he had furnished to the probate
court, but as long as they were satisfied if he could show by

his account that the estate was not able to pay in full I didn't see any need of stirring up any trouble over it."

I am unable to assent to the proposition that with this knowledge on the part of the respondent, and knowing, too, as will later appear, that owing to the complainant's defective system of bookkeeping it was impossible for the complainant to render an account, the respondent was acting in good faith, whatever might be the case had he not had the knowledge he admits having and not seeing "any need of stirring up trouble over it."

Moreover, in the respondent's letter, *supra*, he says that the complainant "represented to me, and I, in your behalf, stated to some of the legatees, that the estate could not pay the legacies in full; and afterwards, when they demanded that the legacies should be paid in full and that you should render an accounting, you then instructed me to inform them that you would pay the full amount of the legacies, providing that they did not insist upon an accounting." It appears from the respondent's letter that Mrs. Whitaker was paid on September 26th, 1909, and it is admitted by the respondent that the $1500 in question was placed in his hands on September 27, 1909. It thus appears that he was informed at the time this fund was placed in his hands that the complainant "would pay the full amount of the legacies, providing they did not insist upon an accounting;" nevertheless the respondent, knowing this to be so, endeavored to induce the three legatees to accept less than their just due. His testimony is as follows (p. 13): "Q. You represented to these legatees the estate would not pay in full when you did not know what the fact was? A. I simply had to take the word of the man who had charge of the estate and funds of the estate, I didn't have any knowledge of my own and simply had to take what he said. . . Q. When did he instruct you first that you pay some of the legatees the full amount of their legacies provided they didn't insist on an accounting? A. It was on the day he brought the fifteen hundred dollars to me. Q. Did you so instruct them? A. I did. Q. Had you told these people, Mrs. Magill, and Mrs. Palmer,

and Mrs. Kelly, that this fifteen hundred dollars had been placed in your hands to settle their legacies? A. Yes, sir. Q. And when had you notified them? A. That very evening. Q. The evening you got the money? A. Yes, sir." (p. 36): "The Court: What I would like to know is whether he had paid you the fifteen hundred dollars before or after the time when he told you he had settled with Mrs. Whitaker. A. He told me after he paid the amount; the same day. Q. Before this letter was written? A. Yes, it was before this letter was written. He didn't tell me what he had paid her. This letter was written after she came and told me about the circumstances." He thus admits he endeavored to induce these "three widowed cousins" to accept less than their just due, believing then, and still believing, the representations which he made to them at the complainant's request, as he says, concerning the assets of the estate, to be false, knowing, too, that the complainant was legally liable on a valid bond for the full amount of them, and having the authority of the complainant that he would pay in full if an accounting was waived.

The respondent's statement before the bar committee as to his acceptance of employment as counsel for the legatees while still acting as counsel for the complainant is as follows: "C. Q. 56. At what time were you employed as you say in your letter of the 30th of September,—employed by the three legatees?' A. The night before. C. Q. 57. This was the night of the 29th of September? A. Yes, sir. C. Q. 58. Up to that time you hadn't been employed by them? A. Never. C. Q. 59. But you was the counsel of Mr. Peirce? A. Yes. C. Q. 60. And without notice to Mr. Peirce you accepted their employment and decided mentally to drop him? A. I did after what I had heard from the other cousin in Fall River."

Concerning this action of the respondent the majority opinion thus states: "He was not trafficking in his former client's interests, or using against the complainant any confidence which had been disclosed by him or any knowledge which the respondent had gained while acting as attorney for the complainant. . . The respondent, by reason of his former relations

with the complainant, was no better prepared to prosecute these claims against the complainant than was any other attorney at the bar," and continuing approves the rule laid down in *Re Boone*, 83 Fed. Rep. 944, as follows: "The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be called upon in his new relation, to use against his former client any knowledge or information acquired through their former connection." If it be conceded that the facts as to the respondent are established to be as stated in the majority opinion, and that he had gained no knowledge while counsel which placed him on any different footing with respect to claims against the complainant than any other member of the bar, it is evident that the respondent is not within the rule above stated, and that the order of the majority that he forthwith withdraw his appearance and desist from the prosecution of claims against his former client is unwarranted and is in derogation of the respondent's right as a member of the bar and an officer of this court.

I am not able to accept the above conclusion as to the fact. The payment in full of a legacy by an executor who has given bond to pay all debts and legacies whatever may be the assets of the estate, is no evidence of a sufficiency of assets to make such payment. In such a case the creditor or legatee resorts to the executor and not to the estate, and an insufficiency of assets does not relieve the executor from liability to pay in full, and so is a matter as to which the creditor or legatee is entirely indifferent.

The respondent reiterates that while making representations concerning the insufficiency of assets which he believed to be false when he made them, and still believes to be false, he nevertheless does not now know whether the estate can or cannot pay in full. His testimony is thus given (p. 9): "When did you first know otherwise, that it was able to pay in full? A. He

told me shortly after he employed me that the estate would not pay in full.    Q.  Yes, but when did he tell you that it would pay, if you know?    A.  I don't know it *now.*"

In this connection it is also proper to note that the payment made to Mrs. Whitaker, and of which the respondent complains, was made according to the testimony of the respondent before this court by the personal check of the complainant for $2240 while a receipt was given him as executor for $1800.    The respondent knew, if the complainant did not know, that under his bond to pay debts and legacies the complainant was bound to pay all legacies in full whether the assets of the estate were sufficient or insufficient for that purpose, nor could he tell from the personal character of the check, or apparently from any information in the possession of Mrs. Whitaker, whether the whole of this payment, or indeed any part of it, was the proceeds of assets of the estate.

It is to be observed that the respondent in his letter demands interest at 6 per cent. for his new clients, and that Mrs. Whitaker had accepted 4 per cent. on her legacy.    There is no evidence as to the rate of interest earned by the assets of the estate for the time prior to this payment.    If the complainant was legally liable to pay 6 per cent. interest, it is evident that Mrs. Whitaker compromised her claim for a less rate.    If the complainant was legally liable to pay only 4 per cent. it is evident that the demand of 6 per cent. contained in the respondent's letter was an attempt at extortion on his part for the excess over 4 per cent.    In either event, it is indisputable that Mrs. Whitaker received no more than was her legal due.

Moreover, the will of Mary E. Holden, the testator, is dated August 11, 1906.    The respondent's statement before the bar committee (p. 29) is that the complainant was appointed executor on September 25, 1906.    In *Wood* v. *Hammond,* 16 R. I. 98, 106, this court determined as follows:    " We think that interest will begin to run on the legacies at the end of one year after the death of the testator, unless some other time is appointed by the will for their payment.    This is the general rule, and we find nothing in the will to prevent its application."    And see

*Esmond* v. *Brown*, 18 R. I. 48, and cases cited.   It is therefore
evident that the demand in the respondent's letter of September
30th, 1909, for interest "for the three years last past" was illegal
and clearly extortionate as to the interest demanded for the
first year succeeding the death of the testatrix, inasmuch as
legal proceedings are threatened if the demand is not complied
with.   Whether in fact the sum of $1800 was that portion of the
amount which came from the estate, the balance being paid by
the complainant, Mrs. Whitaker no more knew than the re-
spondent knew the source of all or any part of the $1500 in
question which he testified was paid to him, part in cash and
part also in the personal check of the complainant.   In fact,
this method of payment by personal check by this executor, who
had given bond to pay all debts and legacies, illustrates the
defects in his system of bookkeeping, of which he had informed
the respondent.   Whatever may have been the undisclosed
fact in respect of this receipt, one thing is certain that in any
accounting which he anticipated he might have to make to
the probate court, he had only a voucher for $1800 paid out of
the assets of the estate and if, in fact, the entire sum of $2240
was paid from the estate, even were he required to so account,
the complainant was still liable on his bond for $440 still remain-
ing in his hands unadministered.   The respondent admits that
he was angry with the complainant for thus doing his plain duty
in this case and thus testified (p. 35)—"THE COURT:   That was
one of the things that made you angry?   Mr. PALMER:   Yes,
sir.   THE COURT:   The fact that he *paid* twenty-two hundred
and forty dollars, I say *that*, not that he paid her in full.   MR.
PALMER:   The fact that he settled with her at all; yes, sir, I
was to make all the settlements."   How such payment of
Mrs. Whitaker by the complainant could have been in any way
injurious to the respondent, who had not been furnished with
money for her legacy, in view of the fact that she received from
the complainant all the interest that she demanded and less than
he demanded for his new clients, and in view of the fact testified
to by the respondent that the complainant had theretofore
personally settled with at least five other legatees, does not

appear. Sufficient does appear, however, as above set forth, to compel me to withhold my assent to the statement in the majority opinion that "Any knowledge as to the condition of the estate and its ability to pay the legacies with interest was not gained by the respondent as attorney for the complainant, but was acquired by the respondent and the three legatees from the disclosure of Mrs. Whitaker." Inasmuch as it has been seen that Mrs. Whitaker knew only that she had received the complainant's personal check for a certain sum, without knowing from what source this money was derived, it is manifest she could not have communicated information as to its source to others.

It is stated in the majority opinion that "In these circumstances, and on their solicitation, the respondent took up the cause of his three cousins for the purpose of compelling the complainant to pay the full amount of their legacies with interest which they then became convinced the estate was sufficient to enable him to do. The impulse which led the respondent to take the claims of his three widowed cousins against the complainant was perhaps a natural one although the engagement was one which the law will not permit." The record discloses that by his own statement, the day following his employment by his "three widowed cousins," he proceeded to appropriate to his own use substantially one-half of their legacies, the full amount of which, less interest, was then in his hands for the express purpose of being paid to them, and instead of suing, if need be, for his own compensation, having so paid himself he has involved them in litigation, which is still pending, to recover the remaining half of their legacies and interest. The record is as follows, in his statement to the bar committee (p. 34): "I took the $725 (the balance claimed by the respondent to be due on his charge of $1000) from the $1500, and distributed $258.33 to each one of the three legatees which was one-third of the balance of $775 which was left. I have the receipts of two ladies, the third party was in New York and I sent a certified check of the Westminster Bank and got a receipt that

the check was paid by them.　Two of the ladies are aunts of mine and the other is a cousin."

On the day of his employment by these ladies the $1500 in his hands was sufficient to pay the full amount of the three legacies of $500 each, without interest.　The respondent has simply paid himself at the present expense of these clients, if not to his further profit, and has cast the burden of delay and the expense of litigation at least upon them.　Viewed in the light of what he has done, I see no reason to commend his course with these ladies, even if, under the circumstances, he had been legally free to enter their employment.　Certainly no such self-serving treatment of the women of his own family can entitle the respondent to claim to be considered as a protector of these widows when the primary result of his course of action, indicative accordingly of his motives, has been to further his own interests and at their expense.

As to the knowledge gained by the respondent in a confidential capacity, and while acting as counsel for the complainant, it should be observed, first, that it appears by the respondent's letter, *supra*, that he had been acting as such counsel for more than three years and charged, and has now received, the sum of one thousand dollars therefor.　Questioned by his counsel before the bar committee, he thus answers (p. 75): "Q. You can't give an estimate of the number of consultations you have had with him?　A. No, I can't definitely, almost continuous.　Q. What was the total value of the estate.　A. That is the thing we were trying to ascertain, have been trying to find out.　He refused to give any figures.　To the best of the ability of the rest of the relatives and statements made by the testatrix, the estate amounted to about $22,000 or $23,000.　Q. I understood you give some estimate of $20,000.　What do you base that upon?　A. It is based upon statements of cousins and nephews and nieces of the testatrix."　While the respondent repeatedly states that he did not know the value of the estate, these statements must be considered with reference to his other statements that he had been almost continuously advising the complainant about the estate for three years, and also must be

considered with reference to his further statement that he considered his charge of $1000 a very small one because the estate amounted to $20,000. That he knew this to be the fact appears from his statement before the bar committee (p. 40): "I have no hesitancy at all in saying here I sent him that bill because I had been his attorney and subject to his call for the period of three years, and I considered $1000 as attorney's fee on an estate of $20,000 a very small one and one that any attorney who gave up his time, whether he did any great amount of work or not, who gave up time and other clients he might have at that time, that was a reasonable thing and that is the reason I made it that amount, and it was because of an agreement he had made that he would pay me my bill when it became due."

A consideration of this statement discloses that his charge is largely based upon the fact that the estate amounted to $20,000, and was not necessarily determined by the fact that there was much or little requirement for legal services in connection with its settlement. The respondent's statement that he did not know the exact amount of the estate, if interpreted as meaning that he did not know by what amount the exact amount of the assets exceeded $20,000, may be accepted for this purpose as in accordance with the fact, but the respondent must be held to the truth of the statement thus made, and he is estopped to deny that he knew that the estate, of which he has thus spoken in the hearing before the bar committee, and for his services to which he has thus charged and received compensation as above stated, did amount at least to the sum of twenty thousand dollars. In this connection it appears that the pecuniary legacies bequeathed in the will are as follows: Warren Heap, $1000; Samuel Malcourt, $1000; Hannah M. Clark, $1000; Jennie A. Bowen, $500; Mary E. McFarlane, $1000; Margaret Jane Pierce, $2000; George W. Palmer, $2000; Martha McGill, $500; Mary Kelly, $500; Gussie Palmer, $500; May Palmer, $500; John W. Whitaker, $2000; Alice Holden, $500; making a total of $13,000. The foregoing summary is not without its bearing on the question of the respondent's

knowledge of the ability of an estate of $20,000 to pay in full legacies amounting to but $13,000 thus left by the will of his aunt, the testatrix.

It further appears from the respondent's statements that while acting as counsel for the complainant he was informed as such counsel that because of the complainant's system of bookkeeping he was unable to render an account of the estate and that the respondent assured him he would tell him what to do and would so arrange matters that the complainant would not be obliged to go into court. The respondent states (p. 43), "I had consultations and meetings with these gentlemen in Fall River to try and settle this, because of the fact that he wanted to give them less than the legacies called for and refused to give an accounting and told me because of his system of bookkeeping he was unable to give an account and wanted me to settle." (p. 76) "I told him what he would have to do. *I said I would take care that it should be arranged so he wouldn't have to go into court,"* (p. 78) "One thing that he agitated most was the settling with these legatees without, rendering an account."

Without further citations from the statements of the respondent, it here clearly appears that the respondent had become possessed of confidential information as to this estate from the complainant and as his counsel which placed him on an entirely different footing from "any other attorney at the bar." He says that the estate amounted to at least $20,000, if not more. It appears accordingly to have been ample to pay in full legacies aggregating only $13,000. He knew that it would be impossible for his client to render any account, owing to his defective system of bookkeeping, and that the payment of $2240 to Mrs. Whitaker and the payment of the $1500 to himself by personal check, in whole or in part, respectively, were further evidence that the executor had not even a bank account in the name of the estate. He knew, too, that the matter which most of all agitated the mind of the complainant was that he should be cited to render an account and thus possibly be removed from the executorship, and he had

specifically promised the complainant that he would so arrange matters that he would be relieved from that necessity.

By the respondent's own statement it appears that the payment to Mrs. Whitaker was made on September 26, 1909, and that on September 27, 1909, she informed him of it, as later also of certain alleged slanderous utterances of the complainant on said September 26th. After three days' deliberation upon this settlement on September 30, 1909, he wrote the letter heretofore referred to in which he severs his connection as counsel for the complainant, having meanwhile accepted employment adverse to the complainant from the three legatees and therein proceeds to deliberately break his plighted word to the complainant, and to take advantage of the complainant's inability to render an account in concluding the demand therein made upon the complainant with these words: "This matter must be settled immediately, or I shall proceed to have a citation issued in the probate court of Providence, to compel you to render an accounting."

Unlike the threat contained therein of a suit for slander, the respondent has carried this threat into action, as appears by his testimony before the court, as follows (p. 12): "Q. Did you institute proceedings in the probate court for an accounting? A. Yes, sir. Q. At the instance of these ladies, Mrs. Magill, Kelly, and Palmer? A. Yes, sir, I have. . . Q. Since the 12th of October, then? A. Yes, sir. . . Q. When did you do that, may I ask? A. I did that between two and three months ago. Mr. Bassett and Mr. Raymond interposed what I would call a plea in the probate court during the pendency of this petition and stated he couldn't render an account because he didn't know what he actually would have to pay out."

The complainant thus finds himself involved in the very litigation against which he had retained, and has now paid the respondent to protect him, and to whom he has confidentially disclosed his inability successfully to defend, and this litigation is instituted and promoted by his former counsel now retained

against him and acting on the information so confidentially acquired.

In commenting on the cases of *U. S.* v. *Costen*, 38 Fed. Rep. 24, and *In re Boone*, 83 Fed. Rep. 944, the majority opinion approves the disbarment of the respondents in each case, but continues: "But we can readily distinguish the facts of those cases from the facts of the case at bar and we can discriminate between the action which this court should take in regard to this respondent and the penalty which was so reasonably imposed upon the respondents in those cases." The cases are, indeed, distinguishable, but the distinction is not one favorable to this respondent. In one of those cases the attorney had simply offered to sell confidential information alleged to be "important," and in the other the attorney had sought to be retained adversely to his former client because of his possession of confidential knowledge alleged to be "important," but in neither case was the offer accepted, and in each case the attorney was disbarred; and this action of the court is approved by the majority opinion. In the present case the attorney has actually instituted litigation at the instance of three clients relying on confidential knowledge that the respondent is defenceless thereto. The difference is the difference between contemplated action frustrated and litigation actually instituted.

The opinion *In re Boone, supra,* continues on the same page (p. 953), and immediately following the portion cited in the majority opinion as follows: "*In re Cowdery,* 69 Cal. 32, 50, 10 Pac. 47, and cases there cited. The duties and obligations of an attorney are aptly and succinctly summed up by Chief Justice Hobart in *Herrick* v. *Catley,* 30 How. Prac. 208, as follows: 'An Attorney oweth to his client fidelity, secrecy, diligence, and skill, and cannot take a reward on the other side.' This brief statement of the duties and obligations which an attorney owes to his client demonstrates of itself, if, indeed, any demonstration is necessary, how utterly inconsistent with the proper and faithful discharge of them, and, in fact, totally subversive of them, would be any rule permitting the attorney to occupy a position hostile to his client, or to use against him

the knowledge he has confidentially acquired.   The authorities. are all of one accord on this proposition, and disbarment has invariably been inflicted on the attorney who has violated, or attempted to violate, this rule of professional conduct.''

*In re Cowdery,* cited in *re Boone, supra,* was a case in which the facts are stated in the syllabus as follows: ''The respondent was elected city attorney of the city and county of San Francisco, and as such had the control, during his term of office, of all litigation in which it was a party.   During his term of office, certain cases against the city and county, in which judgments had been rendered against it, were appealed by him.   After the expiration of his term, and while the appeals were pending, he entered into an agreement with the attorney for the adverse parties that, in consideration of a sum of money paid to him he would not allow himself to be retained in such cases by the city and county.   At the time the agreement was made, the respondent had no personal knowledge of the facts or questions of law involved in the cases.   While in office, he had been paid a salary as provided by law.   *Held,* that the respondent was not discharged from the duty of fidelity to the city and county by the expiration of his term of office, and that the agreement not to be retained by it, was a violation of this duty.''   In this case the attorney was suspended from practice for six months.   In the opinion the decision in *Price* v. *Grand Rapids R. R. Co.* 18 Ind. 137, is cited with approval.   In that case the attorney had been associate counsel for the defendant on the first trial and sought to act as counsel for the plaintiff on a second trial, and the court said (p. 53):   ''And now the question arises can an attorney accept fees on both sides of the same cause?—for though the trials were different, the cause was still the same. On this point there is but one opinion.   Says Professor Sharswood in his Legal Ethics: ' The criminal and disgraceful offense of taking fees of two adversaries ought, like parricide in the Athenian law, to be passed over in silence in a code of professional ethics.'''

It has thus seemed to be requisite to set forth at more length and in greater detail than under other circumstances might be

considered necessary the exact state of the testimony and record in this case upon which I have found myself unable to agree either with the reasoning or with the conclusion of the majority of the court. This has been done wholly upon the statements of the respondent himself and of the sole witness in his behalf, and upon the documentary evidence submitted. In the foregoing observations there is not a reference to or a consideration of any matter or thing not established and admitted by the mouth of the respondent or by the sole witness called in his behalf and such documentary evidence. Several months have elapsed since the report of the bar committee was presented, on December 28, 1909, and since the respondent appeared before this court; and full discussion of the case has been had in which all the members of the court have participated. The importance of the case to the respondent, who has been honored with both judicial and legislative position, has been fully considered. The entire record on his behalf, as above set forth, has been examined and re-examined, again and again, at successive intervals in the endeavor to do exact justice to him, and every presumption of innocence has been allowed in his favor. The result is a firm and abiding conviction that the report of the bar committee is right and that the opinion of the majority of the court, reversing that finding, is not sustained, even upon the respondent's own showing.

The remaining question is as to the form of the order to be made. I concur with the chief justice in his conclusion. "I am also of the opinion that the settlement made as claimed by the counsel should not be permitted to stand, and that the respondent should be required forthwith to repay to the complainant the sum of $725, with interest from October 1st, 1909, and also be required to withdraw from all future participation in the prosecution of claims against the estate of Mary E. Holden, of which the complainant is executor." The repayment of the above amount to be without prejudice to any right of action of the respondent to recover compensation for services rendered to the complainant. As to the clause of the order requiring the respondent to withdraw from further prosecution of claims

.against said estate, the majority of the court have, indeed, reached a similar conclusion, though upon a course of reasoning which I am not able to adopt.

I concur also with the chief justice in his opinion expressed .as follows: "I am of the opinion that the conduct of the attorney in attempting to represent the legatees after he had been ·counsel for the executor of the estate, was highly improper and ·should be punished." And I think the punishment should be ·stated. In *Re Boone, supra,* cited and approved by the majority ·opinion of the court, the rule is thus laid down (p. 953): "The authorities are all of one accord on this proposition, and disbarment has invariably been inflicted on the attorney who has violated, or attempted to violate, this rule of professional con·duct."

In the present case, although it appears that the respondent has been consulted by two legatees other than the three legatees in whose behalf he has instituted proceedings, it does not clearly .appear that he has accepted their employment. While deeming a censure wholly inadequate in so grave a case, I am, nevertheless, not unmindful of the recommendation of the bar committee in that respect, and certainly am not unmindful of the fact that the majority of the court have reached a different con·clusion upon the whole case. I feel, however, that a suspension from the right to practice as an attorney is the least punishment which should be imposed. If that period be made excessive, it amounts practically to a disbarment; and it is therefore my ·opinion that the respondent should be suspended from the practice of his profession for the period of one year for thus acting for each of the three clients aforesaid for whom he has instituted proceedings against the complainant, such periods of suspension to run concurrently and not consecutively.

. *Bassett & Raymond,* for complainant.

*James J. McCabe,* for respondent.